EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* RA-FAEL PÉREZ SANTALIZ, acusado y apelante.

*Número:* CR-76-59 *Resuelto:* 23 de julio de 1976

_____

*Benjamín Ortiz* y *Pedro Otero Fernández,* abogados del apelante; *Miriam Naveira de Rodón, Procuradora General,* y *Candita R. Orlandi, Procuradora General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR TORRES RIGUAL emitió la opinión del Tribunal.

Rafael Pérez Santaliz, Alcalde del Municipio de Quebradillas, fue acusado de ataque para cometer asesinato al hacerle un disparo a Bartolo Rivera Santos infiriéndole una herida de carácter grave. Un jurado lo declaró culpable de ataque para cometer homicidio, delito menos grave, condenándolo el tribunal de instancia a cumplir tres meses de cárcel bajo el régimen de libertad a prueba y a pagar $500.00 de multa.

En apelación Pérez Santaliz impugna el fallo condenatorio señalando como fundamento de revocación, entre otros, que las reseñas de los periódicos sobre la prueba que se presentó en el proceso le privaron de su derecho a un juicio justo e imparcial.

Consideremos en primer término los principios generales que entran en juego para determinar cuándo la publicidad sobre un proceso judicial perjudica el derecho de un acusado a un juicio justo e imparcial. Luego examinaremos las reseñas periodísticas a que se refiere el apelante para ver si propiamente se plantea en el caso un conflicto entre su derecho a un juicio justo e imparcial y la libertad de prensa.

■ Como sabemos, el juicio va dirigido a la búsqueda de la verdad. Nuestro ordenamiento procesal prescribe como garantía del derecho a un juicio justo e imparcial que la culpabilidad del acusado ha de fundarse en la prueba desfilada y en los argumentos aducidos ante el tribunal. El acusado tiene derecho a confrontarse con la prueba en su contra y a que se le pruebe la acusación mediante prueba admisible conforme las normas de relevancia, confiabilidad y certeza que la experiencia secular ha consagrado en el proceso adversativo y no por influencias extrañas al proceso. (Art. II, Sec. 11 Carta de Derechos, Constitución del Estado Libre Asociado.)

■ En la gran mayoría de los casos no surge conflicto alguno entre este derecho del acusado y el derecho de la prensa

—ambos de igual jerarquía constitucional—a publicar lo que ocurre en los tribunales. La publicidad del proceso es útil y deseable porque le brinda al pueblo la oportunidad de enterarse de lo que ocurre en los tribunales y de formar una opinión responsable, que es esencial para corregir cualquier abuso, corrupción o deficiencias en los procedimientos investigativos utilizados por la policía o los fiscales o en la imposición de las penas por el tribunal. La prensa cumple pues una función eminentemente social al divulgar información sobre procesos judiciales. Frankfurter expuso esta función con meridiana claridad:

"Una de las exigencias de una sociedad democrática es que el público sepa lo que ocurre en los tribunales mediante información de la prensa de lo que allí ocurre a fin de que el público pueda juzgar si nuestro sistema de derecho penal es justo y correcto. Por otro lado, nuestra sociedad ha separado la corte y el jurado para determinar la culpabilidad o la inocencia a base de evidencia presentada en corte, hasta dónde sea humanamente posible." *Maryland* v. *Baltimore Radio Show,* 338 U.S. 912, 920 (1950).

Es por eso, que la publicación de noticias sobre el proceso judicial no constituye de por sí una violación al derecho del acusado a un juicio justo e imparcial. *Pueblo* v. *Maldonado Dipiní,* 96 D.P.R. 897 (1969). Si así fuera, no sería posible en la sociedad actual con sus múltiples y diversos medios de comunicación llevar a juicio a acusados de gran notoriedad o casos que por la naturaleza de los hechos imputados están revestidos de interés público, a menos que se interfiriera con el derecho de la prensa a publicar noticias de interés general. La mera publicidad pues no es suficiente para la anulación del veredicto. El acusado tiene que probar la posibilidad de perjuicio, lo cual depende fundamentalmente de la naturaleza de la información periodística y del grado de exposición del jurado a la misma.

La posibilidad de perjuicio surge cuando la prensa divulga hechos que no han pasado por el tamiz del juicio y que, por

tanto, el acusado no ha tenido la oportunidad de confrontarlos en el proceso adversativo. En tales casos la información periodística lleva el germen que puede pervertir el proceso adjudicativo. Véanse *Pueblo* v. *Fournier*, 77 D.P.R. 222 (1954); *United States* v. *Marshall*, 360 U.S. 310 (1958); *United States Ex Rel. Doggett* v. *Yeager*, 472 F.2d 229 (3d Cir. 1973) y *United States* v. *Thomas*, 463 F.2d 1061 (7th Cir. 1972).

En *Pueblo* v. *Fournier*, supra, se revocó el veredicto, entre otras razones, por publicidad excesiva de una confesión inadmisible; en *United States* v. *Marshall*, supra, la divulgación de prueba no inadmisible al efecto de que el acusado había sido convicto en dos ocasiones por delito grave y que había admitido que practicaba ilegalmente la medicina, dio motivo a la revocación; en *United States Ex Rel. Doggett* v. *Yeager*, supra, la divulgación de una alegación de culpabilidad que fue retirada junto a la información de que el acusado había intentado fugarse, se consideró suficiente para revocar el veredicto.

Nótese que en todos estos casos la información periodística se refería a hechos que directamente inducían la determinación de culpabilidad: confesión, fuga, comisión de actos similares a los imputados en la acusación.

 La posibilidad de perjuicio también puede surgir cuando la publicidad es parcializada, inflamatoria, derogatoria o tan intensa que pueda razonablemente inferirse una atmósfera de pasión contra el acusado. Así, se ha anulado el veredicto por publicidad masiva en *Sheppard* v. *Maxwell*, 384 U.S. 333 (1966), en que tanto el juez como el fiscal utilizaron el proceso para fines políticos personales. El juicio comenzó dos semanas antes de una reñida elección en que ambos eran candidatos a puestos judiciales. Los medios de comunicación ocupaban casi todo el salón de sesiones acorralando al acusado. El continuo ir y venir de los reporteros y camarógrafos entorpeció y creó confusión en el proceso. Hasta se acomodó una radioemisora al lado del salón de deliberaciones. La publicidad

llegó a cubrir materias incriminatorias que nunca fueron ofrecidas como prueba. A pesar del perjuicio al acusado el tribunal no tomó providencias efectivas para controlar el juicio y el efecto de la publicidad masiva. En *Estes* v. *Texas*, 381 U.S. 532 (1964), se montó un aparato publicitario invadiendo las cámaras de televisión y las radioemisoras la sala del tribunal. Se anuló el veredicto por considerarse que la publicidad masiva del proceso violaba el derecho a un juicio justo. En *Rideau* v. *Louisiana*, 373 U.S. 723 (1962), se pasó por la televisión una película de una entrevista del acusado con el alguacil en la que el acusado aparecía admitiendo el robo de un banco, un secuestro y un asesinato. La película se exhibió en varias ocasiones y fue vista por más de dos terceras partes de la población. Se anuló el veredicto. En *Irvin* v. *Dowd*, 366 U.S. 717 (1960), se revocó el veredicto por la publicidad intensa que recibió un comunicado de prensa emitido por el fiscal y la policía en que se informaba que el acusado había confesado la comisión de seis asesinatos. En *United States* v. *Concepción Cueto*, 515 F.2d 160 (1st Cir. 1970), se revocó el veredicto por información derogatoria del acusado. El último día del juicio un periódico publicó información que describía al acusado como uno de los más importantes y más peligrosos traficantes de drogas en Puerto Rico, Miami y el Caribe; se le identificó en la información como un "peje gordo" que se había escapado en dos ocasiones al momento del arresto, entrándose a tiros con la policía en la segunda ocasión. En *United States* v. *Kum Seng Seo*, 300 F.2d 623 (3d Cir. 1972), se revocó el veredicto por información periodística que revelaba que la acusada estaba en la cárcel con fianza de $100,000.00 y que se había ocupado droga en su habitación, sin ser ello cierto. La información periodística fue mostrada por uno de los jurados a los demás miembros del panel antes de la votación para veredicto.

Estos casos ilustran situaciones excepcionales de publicidad masiva e inflamatoria o divulgación de hechos de natura-

leza derogatoria que pueden pervertir el proceso de adjudica-
ción en menoscabo del derecho del acusado a un juicio justo
e imparcial.

Por otro lado, se ha resuelto que no constituye perjuicio la
información periodística que reseña la prueba desfilada aun
cuando pueda haber alguna incorrección. En *Commonwealth*
v. *Snopek*, 190 A.2d 101 (Penn. 1963), el tribunal rechazó
la posibilidad de que el jurado pudiera ser confundido con
respecto a la naturaleza del delito imputado por información
periodística que usara las palabras "rapto" y "secuestro" en
vista de que se instruyó al jurado de que el cargo que se tenía
que considerar era el de violación. En *State* v. *Booton*, 329
A.2d 376 (N.H. 1974), se publicó incorrectamente informa-
ción de que el juez mantuvo la acusación de asesinato sobre
la objeción del acusado de que no se había probado malicia
cuando el hecho correcto fue de que el juez mantuvo la acusa-
ción sin perjuicio de considerar la objeción más tarde en el
juicio. La inexactitud se consideró sin importancia. En *United
States* v. *Persico*, 425 F.2d 1375 (2d Cir. 1950), se publicó
información de que el acusado estaba conectado con Cosa
Nostra, que se conocía por el mote de "El Reptil", que se
había graduado en la pandilla de Profaci y que el fiscal pre-
sentaría como testigo de cargo a un pandillero de nombre
Valachi, conocida figura de la Mafia que se había convertido
en informador del Gobierno y que declararía sobre admisiones
que le hizo el acusado mientras ambos estaban en prisión. El
tribunal confirmó el veredicto de culpabilidad considerando
que la información periodística no se refería a la culpabilidad
del acusado sino más bien constituía información de trasfondo,
la mayor parte de la cual fue traída al juicio como prueba
admisible.

A la luz de lo anterior, examinemos ahora las reseñas
periodísticas que el apelante considera perjudiciales. Durante
el curso del juicio que comenzó el 28 de abril de 1975 y con-
tinuó durante los días 1, 2, 5 y 6 de mayo, los periódicos

publicaron la siguiente información sobre la prueba desfilada:

1) Reseña del 29 de abril de 1975 del periódico El Vocero con el título "EMPIEZA JUICIO ALCALDE QUEBRA-DILLAS" en la cual se resume con exactitud el procedimiento de insaculación del jurado que se había llevado a efecto en la sesión del día anterior y se informa sobre las personas que integraron el panel.

2) Reseña del 30 de abril de El Vocero con el título "JUICIO OTERO FERNANDEZ ACUSADO AGREDIR MUJER" informando que comenzó a ventilarse en el Tribunal de Distrito de San Lorenzo un caso contra el Lcdo. Pedro Otero Fernández por acometimiento y agresión grave. En la información se hace referencia al hecho de que dicho letrado es el mismo que representa al Alcalde de Quebradillas, Rafael Pérez Santaliz, sobre quien pesa una acusación de ataque para cometer asesinato.

3) Reseña del 1ro. de mayo de El Vocero con el título "Testigo Dice: VI AL ALCALDE HACER EL DISPARO EN COLISEO." La reseña resume fielmente la declaración del testigo de cargo Pedro Mulero García. La reproducimos a continuación porque ésta es una de las reseñas que el apelante considera que le privó de su derecho a un juicio justo e imparcial:

"Afirmando categóricamente que vio al alcalde de Quebradillas, Rafael Pérez Santaliz hacerle un disparo a Bartolo Rivera Santos el 25 de agosto del año pasado en el Coliseo Roberto Clemente, Pedro Mulero García declaró ayer, que una vez el alcalde vio caer al empleado del coliseo, el arma se le cayó de las manos y él (Mulero) la agarró y la entregó a un policía de apellido Rivera.

La demoledora declaración surgió durante el primer día del juicio que por ataque para cometer asesinato se sigue contra el funcionario público. El caso se inició a las once de la mañana, presidiendo el juez Superior José M. Aponte Jiménez, en la sala 8 del Tribunal Superior de San Juan, recinto de Hato Rey. El fiscal Waldemar Cima de Villa hizo la exposición inicial mani-

festando que se proponía probar, más allá de toda duda razonable, la culpabilidad del acusado. Dijo que probaría que el acusado actuó de forma deliberada, mal intencionada y que trató de matar al empleado del Coliseo.

## Atacan al Arbitro

El primer testigo presentado por fiscalía fue Pedro Mulero García, quien en el interrogatorio directo a que fuera sometido por el fiscal Pedro Colton dijo que faltando 22 segundos de un tiempo extra, después de una decisión desfavorable al equipo de Quebradillas, un fanático, identificado en Corte abierta por Mulero como Rafael Cruz Muñiz, chófer y guardaespaldas del alcalde de Pérez Santaliz, [sic] atacó al árbitro Junior Baldrich y al baloncelista de los Santos del San Juan, Sammy Betancourt.

## Quieren Expusarlo

Agregó el testigo que después de la agresión, los empleados del Coliseo Roberto García y Víctor Manuel López, agarraron a Cruz Muñiz por los brazos con la intención de expulsarlo del estadio. Al frente de ellos, abriendo paso entre las pocas personas que habían en el pasillo, iba Bartolo Rivera Santos. Añadió el testigo Mulero que cuando esto ocurría, se presentó el alcalde de Quebradillas y gritó que soltaran a Cruz Muñiz, a la vez que se sacaba un revólver calibre 38 de dentro de la camisa que llevaba por dentro del pantalón.

Recalcó el testigo que sin mediar más palabras, Pérez Santaliz apretó el gatillo disparando una sola vez. El plomo alcanzó a Rivera Santos en la parte derecha de su cuerpo, cerca de la clavícula derecha. El balazo lo hizo desplomar de bruces. Más adelante, Mulero dijo que él estaba como a 6 pies del alcalde y que éste a su vez se encontraba como de 10 a 15 pies de Rivera Santos. También declaró que cerca de Pérez Santaliz había un niño de aproximadamente 10 a 12 años pero no sabía si era hijo del acusado.

## No Cruzan Palabras

Afirmó Mulero en repetidas ocasiones que sólo vio al alcalde Pérez Santaliz hacerle un disparo a Rivera Santos y que fue de frente, sin que mediaran personas entre el alcalde y el propio perjudicado.

En la sesión de la tarde, el testigo fue sometido al contrainterrogatorio del abogado defensor, Lic. Pedro Otero Fernández, quien en varias ocasiones confundió al testigo, pidiendo contestaciones categóricas y precisas con relación a distancias y puntos cardinales. En más de una ocasión, hubo amagos de discusión entre defensa y fiscales por la forma de interrogar del Lic. Otero. De no intervenir el Juez Aponte Jiménez, la discusión hubiese tomado otro matiz.

Declara Policía

Momentos más tarde, los fiscales pusieron a declarar al policía José Ramón Rivera, quien declaró que, en varias ocasiones, antes de terminar el partido había entrado al estadio para ver cómo iban las cosas. Fue luego de producirse la agresión contra el árbitro que fue a la cancha y sacó a dos personas del coliseo y que cuando regresaba al interior, oyó una detonación y que al dirigirse al lugar del ruido pudo ver a Pérez Santaliz con el arma en las manos todavía. Agregó que Mulero García recogió el arma después que se le cayó al alcalde y se la entregó a él.

El proceso habrá de continuar hoy a las nueve y media en la sala 8 de Hato Rey."

4) Reseña del 1ro. de mayo de 1975 del periódico San Juan Star con el título "WITNESS SAYS QUEBRADILLAS MAYOR SHOT USHER" y en la que también se resume con exactitud el testimonio del testigo Pedro Mulero García.

5) Reseña del 2 de mayo de 1975 de El Vocero con el título "Empleado Coliseo Declara: ALCALDE ME HIZO EL DISPARO", resumiendo con exactitud el testimonio del perjudicado aunque cualificando la acción de los fiscales. Transcribimos a continuación parte de la reseña para mayor claridad de la exposición:

"En un movimiento sorpresivo e inesperado, el Ministerio Público hizo suya y presentó en evidencia, una declaración jurada prestada por el perjudicado Bartolo Rivera Santos y que fuera sometida por el abogado defensor Pedro Otero Fernández. La declaración jurada de Rivera Santos fue traída por Otero en la esperanza de impugnar la declaración del testigo de los fiscales, por alegadas contradicciones del propio Rivera Santos,

pero, resultó en un arma de doble filo para la defensa cuando la declaración jurada sostenía la posición invariable mantenida por Bartolo a los efectos de que siempre se le ha conocido por un solo nombre: Bartolo Rivera Santos.

### Acción Ágil

La defensa había mantenido desde el principio de su contrainterrogatorio la posibilidad de que Bartolo fuera conocido por el nombre de Bartolo Rivera Rivera. Para culminar la acción ágil y sagaz de los fiscales, el juez José M. Aponte Jiménez, quien preside en el caso contra el alcalde de Quebradillas, Rafael Pérez Santaliz, admitió en evidencia la declaración ofrecida por el fiscal Pedro Colton, aunque fue traída a sala por el Lic. Otero Fernández.

Observadores presentes del raro incidente legal, señalaron a este redactor que la acción 'bien pudiera ser el jaque mate en el caso contra el alcalde quebradillano.' Sostuvieron su creencia, los que así opinaron, entre ellos un ex fiscal y un ex juez, que pudieron 'notar' como la defensa que venía hilvanando Otero Fernández se desmoronaba.

La sesión de ayer comenzó con el testimonio del detective Francisco Aponte que fue la persona que realizó la investigación y sometió el caso en contra del alcalde, además de presentar el arma de fuego y cuatro balas para las pruebas de laboratorio. . . ." [1]

6) Reseña del 3 de mayo de 1975 de El Vocero con el título "Juicio contra Alcalde: TESTIGO DEFENSA SE CONTRADICE". Se resume el testimonio del testigo Edwin Durán González, informando con exactitud las contradicciones en que incurrió dicho testigo.

7) Reseña del 4 de mayo de 1975 del periódico El Mundo con el título "TESTIGOS DEFENSA PEREZ SANTALIZ INCURREN SERIAS CONTRADICCIONES" resumiendo también con fidelidad los testimonios y contradicciones en que incurrieron los testigos de defensa Juan López Vélez y Edwin Durán González.

---

[1] La información continua. con un resumen fiel de la declaración de los testigos de cargo en el juicio.

8) Reseña del 6 de mayo de 1975 de El Mundo con el título "Otro Testigo Afirma Pérez Intercedió Apaciguar Público: JUEZ ALEGA VIO ALCALDE QUEBRADILLAS SACAR REVOLVER PERO NO DISPARARLO" también resume con exactitud los testimonios y contradicciones en que incurrieron otros tres testigos de defensa.

9) Reseña del 6 de mayo de El Vocero con el título "En Juicio Alcalde Quebradillas: DESMIENTEN A TESTIGOS DE DEFENSA" también resume con exactitud el testimonio de tres testigos de la defensa. El apelante se queja de la forma en que se describieron los testimonios en dicha reseña. La reproducimos a continuación en la parte objetada:

"Desmintiendo totalmente el testimonio de todos los testigos presentados hasta ayer por la defensa en el caso que se sigue contra el alcalde de Quebradillas, Rafael Pérez Santaliz, el profesor del Colegio Regional de la UPR, recinto de Arecibo, Rafael Morales Morales declaró ayer que cuando un grupo de aproximadamente 15 personas acosaban al alcalde y lo arrinconaron contra una pared del Coliseo, su chófer y guardaespaldas, Rafael Cruz Muñiz estaba a su lado derecho, mientras el hijo del alcalde se encontraba a la izquierda.

Dicha declaración desvirtuó los testimonios previos de los testigos presentados por el propio Lic. Pedro Otero Fernández, en cuanto a que todos ellos, incluyendo un ministro evangélico, un juez de distrito y un gerente de banco, habían afirmado que Cruz Muñiz, había sido sacado a la fuerza por guardias de seguridad del estadio y que más tarde fue que el alcalde fue acosado por la multitud."

■ Como puede verse, la información publicada se refiere a la prueba que desfiló en el juicio reseñándola con fidelidad. Nada hay en ella que no hubiese sido oído o visto por el jurado que condenó al apelante. Los hechos divulgados por los periódicos pasaron por el tamiz del proceso adversativo y si en alguna forma la información periodística pudiera considerarse adversa fue porque la prueba que desfiló ante el jurado fue adversa, demostrando más allá de duda razonable la culpabilidad del apelante.

No es este el caso de publicidad masiva o inflamatoria de la cual pueda inferirse prejuicio. Tampoco se trata de la publicación de material peyorativo sobre el acusado, o, de hechos criminosos, o, de hechos que no fueron objeto de prueba en el juicio. Como ya vimos, se trata de meros comentarios sobre la prueba desfilada en dos de las nueve reseñas publicadas. Cocomentarios que resultan inocuos en comparación con la causticidad de los informes finales al jurado en que tanto el fiscal como la defensa analizan el alcance y fortaleza de su prueba frente a la debilidad de la prueba contraria en lenguaje abultado y efectista.

El debido proceso de ley no requiere una asepsia absoluta en el juicio. Tal criterio no es factible en una sociedad abierta como es la nuestra. El enfoque tiene que ser pragmático a fin de facilitar la armonía de ambos valores—el de una prensa libre y el de un juicio justo—fundamentales en nuestro ordenamiento constitucional. *Domínguez Talavera* v. *Tribunal Superior*, 102 D.P.R. 423, 428 (1974).

El derecho crece y se consolida desechando ficciones y afincándose en la realidad. Es imposible mantener a los miembros del jurado libres de contaminación. Es decir, sin noción alguna sobre el caso. Lo importante en el proceso es que el veredicto responda a la prueba desfilada. "Es suficiente"— dijo el Juez Clark en *Irvin* v. *Dowd*, supra, a la pág. 723— "si el jurado puede echar a un lado su impresión u opinión y rendir un veredicto basado en la prueba desfilada."

El tribunal de instancia cuenta con diversos remedios para atender la armonización de ambos valores: a) la posposición del caso cuando la publicidad es de tal índole que pueda razonablemente inferirse una corriente de prejuicio contra el acusado, b) la investigación del jurado tanto al momento de ser seleccionado como en las diferentes etapas del juicio, según lo requieran las circunstancias, c) las instrucciones específicas al jurado tanto durante el proceso como al final del mismo

dependiendo de la necesidad, d) el secuestro del jurado cuando a juicio del tribunal se justifique. Todas éstas son medidas útiles cuya aplicación en casos particulares queda a la discreción del juez que preside el juicio. *Marshall* v. *United States*, supra. El tribunal de instancia ejerció adecuadamente su discreción al instruir adecuadamente al jurado en las siguientes palabras:

"Tampoco pueden ustedes considerar y menos dejarse influir por las informaciones, comentarios u opiniones a favor o en contra del acusado, sobre la prueba presentada durante el proceso y que haya sido difundida por los distintos medios noticiosos del país, tales como, la prensa, la radio y la televisión. Los señores del jurado deberán borrar de sus mentes cualquier información obtenida por ustedes, a través de dichos medios, y les instruyo enfáticamente, les exhorto para que rechacen todo tipo de información, opinión o comentario, que no haya sido o que no sea el producto de la evaluación que ustedes hagan de la prueba, tal y como ha sido presentada por las partes, escuchada por ustedes en corte abierta y admitida por el Tribunal durante el proceso." (2da. p. T.E. pág. 171.)

Concluimos que las reseñas publicadas por la prensa durante el juicio del apelante no perjudicaron su derecho a un juicio justo e imparcial. (²)

■ El apelante también señala como error el que el tribunal de instancia no llevara a cabo una investigación del jurado para determinar qué efecto había tenido en éste las reseñas periodísticas. La conclusión a que hemos llegado anteriormente sería suficiente para disponer de este apuntamiento. Tratándose, como hemos visto, de comentarios inocuos vertidos en reseñas periodísticas que resumen fielmente lo que el jurado oyó y vio en el juicio, no era necesaria la averiguación propuesta tímidamente por el apelante.

Surge de la vista sobre la moción de nuevo juicio que el

---

(²)El apelante no discute en su alegato los efectos de la publicidad anterior al juicio, lo cual nos releva de considerar la cuestión.

propio apelante tenía dudas de si la indagación era o no aconsejable. El juez de instancia resume la situación como sigue:

"HONORABLE JUEZ:

Es como el compañero ha mencionado, lo que ocurre, lo que ocurrió en Cámara, que no está en récord, y yo quiero dejar sentado para récord lo siguiente: en dos ocasiones el compañero me indicó sobre algunos artículos que habían aparecido en la prensa, siempre fui de opinión que el compañero debía al menos para el récord ofrecer en evidencia los artículos en cuestión, sin embargo, si mal no recuerdo, si la memoria no me es infiel, la posición del compañero era que podría ser más perjudicial para el acusado el llevar a conocimiento de los jurados los artículos publicados, que permanecer en silencio. A pesar de ello, expresé, o siempre le indiqué al compañero, y le repito, si mi memoria no me es infiel, que independientemente llevado o no el compañero para el registro debía al menos, indicar los artículos a que tenía objeción. De todas formas no hicimos, no . . . o no tomamos en consideración el anuncio del compañero como formal, precisamente, tomando en consideración lo que el compañero nos había informado, que entendía, que era más perjudicial para la Defensa o para el acusado el llevar a conocimiento del jurado sobre estos artículos que permanecer en silencio. Me parece que eso fue, a grandes rasgos, lo que ocurrió. Creo que en dos ocasiones el compañero me llamó la atención antes del juicio, digo, antes del día 6 de mayo, perdón. Obviamente yo no le puedo resolver una cuestión a base de lo que el compañero pueda haber pensado. El compañero dirige el proceso de su acusado, y es lo que hace, hacer las solicitudes al Tribunal a favor de su representado, cuando digo su acusado, digo su representado. De manera que si el compañero adopta una actitud de que no se debe llevar a la mente del jurado sobre el particular, pues, sencillamente, el Tribunal tiene sus manos atadas y no puede obligar al compañero a que el compañero haga lo que entiende el Tribunal o lo que entiende el Tribunal que no debe hacer; quiero que el récord esté claro con respecto a esta cuestión, y que el Tribunal no tomó acción precisamente tomando en consideración las manifestaciones del compañero y el criterio del compañero sobre el particular." 3ra. pieza T.E. págs. 104–107.

Las expresiones del juez fueron confirmadas por el propio apelante:

"Lic. Otero Fernández:

Con la Venia del Tribunal, me llama la atención algo que Su Señoría ha dicho para récord, la primera, que por primera vez para el registro, repito, por primera vez para el registro, 6 de mayo, la Defensa llamó la atención al Tribunal y en la segunda, el día 6 de mayo formalmente, la Defensa llamó la atención para el Tribunal. Yo quiero que el Tribunal deje claro que cuando se estuvieron escribiendo estos artículos, en Cámara, *llamamos la atención de la aparición de los mismos en prensa, discutimos la situación con el Tribunal y resultaba que era más gravoso que el Tribunal fuera a hacer una indagación persona por persona en ese momento, de si habían escuchado o habían o no leído las manifestaciones hechas en la prensa, que efectivamente, de hacer lo que Su Señoría finalmente hizo, tratarlo de corregir al final del procedimiento, cuando con una instrucción general se trató de llenar esta laguna que existía.*" (3ra. pieza T.E. págs. 102–103. Énfasis suplido.)

■ No se cometió el error señalado, como tampoco incidió el tribunal de instancia al no permitirle al apelante renunciar al jurado y someter el caso por tribunal de derecho cuando ya había desfilado toda la prueba. Una vez comenzado el proceso el tribunal tiene amplia discreción para aceptar la renuncia al jurado. *Pueblo v. Rivera Suárez*, 94 D.P.R. 510 (Dávila, 1967). Nada aduce el peticionario que nos mueva a alterar el ejercicio de esta discreción por el tribunal de instancia.

No podemos pasar por alto que el apelante obtuvo innecesariamente toda la transcripción de la prueba a pesar de que afirmativamente expresa en su alegato que los errores señalados no tienen relación alguna con la prueba. Ello ha causado la demora indebida del trámite de apelación. La transcripción inútil de prueba ejemplificada por este caso, es la mayor causa de congestión y demora en el perfeccionamiento del proceso apelativo. Véase *Rodríguez v. Commonwealth Insurance Co.*, 104 D.P.R. 879 (1976).

■ La actuación del abogado del apelante al recargar indebidamente el trámite judicial con una transcripción total de la prueba que era evidentemente fútil revela una actitud

desconsiderada hacia los procedimientos judiciales que merece nuestra más enérgica reprobación.

*Se dictará sentencia confirmando la apelada.*

El Juez Presidente Señor Trías Monge no intervino.