EL PUEBLO DE PUERTO RICO, apelado, *v.* JORGE L. CHAAR CACHO, acusado y apelante.

*Número:* CR-79-48     *Resuelto:* 6 de febrero de 1980

*Jorge L. Chaar Cacho,* por su propio derecho; *Héctor Lugo Bougal, Alfredo Archilla Guenard* y *Miguel L. Chaar Cacho,* abogados del apelante; *Héctor A. Colón Cruz, Procurador General, Federico Cedó Alzamora, Procurador General Auxiliar,* y *Héctor Rivera Cruz, Fiscal,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR DÁVILA emitió la opinión del Tribunal.

El apelante fue acusado de asesinato en primer grado y de tres delitos de apropiación ilegal agravada. Renunció a su derecho a juicio por jurado. Terminada la prueba de cargo, el apelante sometió su caso sin ofrecer prueba de defensa.

La prueba relacionada con la acusación de asesinato en primer grado estableció los siguientes hechos. Don Flores

Rivera tenía un apartamento en San Sebastián. El aparta-mento tenía rejas y él las mantenía cerradas, abriéndolas únicamente para recibir personas de confianza. El día de los hechos Don Flores Rivera había cenado en la casa de una de sus hijas y luego se retiró a su apartamento. El acusado intentó localizar a Don Flores Rivera y al ser informado que éste se encontraba en San Sebastián, el acusado expresó su intención de ir a verlo.

Edwin González Cortés declaró que vivía en San Sebastián en un apartamento y que Don Flores Rivera vivía en otro apartamento del mismo edificio. Ambos vivían en el segundo piso. El día 16 de diciembre de 1975 se encontraba en su apartamento acompañado por Israel Román. Cerca de las siete de la noche oyeron unos gritos como de una persona que gritaba duro, quejándose. Ambos salieron al pasillo del edificio y observaron que los gritos se originaban en el baño del apartamento de Don Flores Rivera. La ventana del baño estaba semiabierta y pudo observar al acusado abriendo la puerta del baño y saliendo. Se colocó cerca de la entrada del apartamento y observó salir primero a una persona descono-cida y luego al acusado. Llamó al acusado pero éste no le contestó. Entró al apartamento acompañado por Israel Román y encontraron a Don Flores Rivera acostado boca abajo en el piso en un charco de sangre. Salieron para avisar a los familiares pero éstos ya estaban llegando al lugar. Había conocido al acusado por algún tiempo por haber firmado una escritura ante él y haberse ofrecido a ser su testigo en un caso de licencia de portación de armas.

Juan I. Medina declaró que el 16 de diciembre de 1975 él era policía estatal y estaba de turno en el cuartel de San Sebastián. Comenzó a trabajar esa noche a las 7:30 P.M. Antonio Acevedo fue a informarle que habían asesinado a Don Flores Rivera. El Sargento Vega y el policía Sánchez salieron para el sitio donde ocurrieron los hechos. A los pocos minutos llegó el acusado al cuartel sudoroso y jadeando y le pidió agua. El acusado le dijo que había observado a las

personas que agredieron a Don Flores Rivera y al ver lo que estaba ocurriendo abandonó el lugar y fue al cuartel de la policía. Mientras hablaba con el acusado notó que el reloj y los espejuelos de éste tenían manchas de sangre. Le preguntó al acusado sobre las manchas de sangre y éste, sin ofrecer explicación alguna fue y se limpió las manchas.

Jesús Mojica Quiñones declaró que para la fecha de los hechos él era agente del Negociado de Investigación Criminal en Aguadilla. Siguiendo instrucciones del Fiscal Román se dirigió hacia el apartamento de Don Flores Rivera. Al llegar, entró al apartamento de Don Flores Rivera y luego de hablar con el Fiscal Nolla inspeccionó el área completa de la casa. Observó que en la mesa de la cocina se encontraba un litro de *whiskey* marca White Label ligeramente usado, dos vasos plásticos desechables y un vaso de cristal con agua. No se veían señales de lucha en el cuarto. Vio el cadáver en un charco de sangre en el baño.

Luis A. Román declaró que hace aproximadamente cinco años que ocupa el puesto de Fiscal Jefe en Aguadilla. La noche de los hechos, cuando le informaron sobre el asesinato, se dirigió directamente a la residencia de Don Flores Rivera acompañado por el agente investigador y el fotógrafo. Llegaron a dicha residencia como a las nueve de la noche. Tomaron una serie de fotografías. En el piso del baño, cerca de la puerta, había dos huellas en sangre de tacos de zapatos. Luego del baño, inspeccionaron todas las habitaciones del apartamento. El apartamento tenía una sola puerta de entrada y salida. Después de terminar su investigación se dirigió hacia el cuartel de San Sebastián. Al llegar al cuartel se encontró con Chaar Cacho quien le indicó que había estado en el apartamento de Don Flores Rivera esa noche y sería su testigo estrella. Decidió tomarle una declaración jurada a Chaar Cacho quien no se opuso. Cuando iba a comenzar a hacerle preguntas, Chaar Cacho no lo dejó seguir sino que insistió en narrar él lo ocurrido. Mientras Chaar Cacho le narraba lo sucedido él observó unas manchas de sangre en las

botas y los pantalones de éste. Le preguntó a Chaar Cacho cómo se había manchado con sangre. Al oír esa pregunta Chaar Cacho se levantó y rehusó seguir declarando. Instruyó a un agente que llevara a Chaar Cacho a su casa y le ocupara la ropa que tenía puesta. A insistencias de Chaar Cacho envió a un policía a buscar el *jeep* de éste que se había quedado estacionado frente al apartamiento de Don Flores Rivera y a traerlo al cuartel.

Raúl Marcial Rojas declaró ser director del Instituto de Medicina Legal. Declaró que fue consultado por el Doctor Marino Sorvill en relación con la autopsia practicada al cadáver de Don Flores Rivera. Surge del protocolo de autopsia la existencia de contusiones múltiples sobre la región frontal, una herida delante de la oreja derecha, hematomas en ambos ojos, una herida sobre la ceja izquierda, una herida puzante en el hemitórax izquierdo y una herida incisa localizada en la región parietal derecha. También surge del protocolo que estaban fracturadas las costillas tercera, cuarta, y sexta en ambos lados. La causa de muerte fue el efecto conjunto de los múltiples traumatismos severos y las hemorragias.

Ana Mercedes Martínez declaró que era tecnóloga médica del laboratorio criminal de la Policía de Puerto Rico. En relación con los hechos ocurridos el 16 de diciembre de 1975 había realizado algunos análisis en el laboratorio. Recibió de manos del Fiscal Nolla unas piezas de evidencia y Leida Rodríguez, otra tecnóloga médica, recibió otras piezas de evidencia. La muestra de sangre del Señor Flores Rivera identificada con el número 3329 ML75 era de tipo O. Que en el *Exhibit* A del Pueblo (identificado adecuadamente como el pantalón que vestía el acusado la noche de los hechos) determinó la presencia de sangre humana de tipo O. En el *Exhibit* O del Pueblo (identificado adecuadamente como el papel toalla utilizado por el acusado al lavar sus espejuelos y reloj en el cuartel) pudo determinar la presencia de sangre de tipo O. En el *Exhibit* I del Pueblo (identificado adecuadamente

como las botas que usaba el acusado la noche de los hechos) pudo determinar la presencia de sangre humana. Que la bota derecha tenía sangre en la parte interior y en la superficie. La bota izquierda tenía sangre en la parte interior y en toda la suela y el taco.

El tribunal declaró culpable al apelante y lo condenó a cadena perpetua en el caso de asesinato en primer grado y a cumplir una pena de tres a ocho años de presidio en los casos de apropiación ilegal agravada. Señala el apelante la comisión de seis errores en relación con la celebración del juicio y su convicción por el delito de asesinato en primer grado. El apelante no hace apuntamiento alguno en relación con su convicción en los casos de apropiación ilegal agravada. Los errores señalados son los siguientes:

"*Primer Error:* Cometió gravísimo error de derecho el Honorable Tribunal de Instancia al no decretar la anulación del presente proceso, una vez se estableció que el Ministerio Fiscal había examinado y tomado declaraciones a los testigos de defensa, conculcando y eliminando de este modo el derecho constitucional del Lic. Jorge Luis Chaar Cacho de presentar 'testigos a su favor'.

*Segundo Error:* Por actuaciones indebidas e ilegales del Ministerio Fiscal se violó el derecho constitucional del acusado a un debido procedimiento de ley por vía a la violación del resguardo del principio absoluto a la no incriminación y a un 'proceso limpio', ingrediente indispensable en nuestro sistema de un juicio justo e imparcial.

*Tercer Error:* Cometió gravísimo error de derecho el Tribunal de instancia al admitir en evidencia supuestas manifestaciones del acusado al Hon. Fiscal Román, sin las previas advertencias de ley y cuando el Fiscal que lo interroga, y que luego testifica en corte, sin duda alguna, tenía en su mente que el acusado era un sospechoso y no un mero testigo.

*Cuarto Error:* Cometió grave error de derecho el Honorable Tribunal de instancia al permitir la declaración del Hon. Fiscal Luis A. Román, sin que la misma fuese indispensable, privando en esta forma al acusado de un juicio justo e imparcial.

*Quinto Error:* Cometió grave error de derecho el Tribunal de instancia al ordenar caprichosamente el traslado del presente caso del Tribunal Superior de Aguadilla al Tribunal Superior de San

Juan, sin fundamentos de hecho ni amparo en los principios de ley vigentes en Puerto Rico, para un traslado de un caso criminal, y en contravención de la cláusula constitucional que garantiza en Puerto Rico el derecho a juicio por jurado.

*Sexto Error:* Cometió grave error de derecho el Honorable Tribunal de instancia al declarar culpable al Lcdo. Jorge Luis Chaar Cacho, del delito de Asesinato en Primer Grado, ya que un análisis sereno y jurídico de las pruebas aportadas no establecen la culpabilidad del acusado más allá de toda duda razonable y fundada."

El primer señalamiento de error sostiene que procedía la anulación del proceso una vez se estableció que el Ministerio Fiscal había examinado y tomado declaraciones a los testigos de defensa.

El Art. 11 del Código de Enjuiciamiento Criminal dispone que el fiscal no deberá "interrogar a los testigos del acusado, excepto en el acto de celebrarse el juicio". En *Pueblo v. Tribunal Superior*, 99 D.P.R. 98, 105 (1970), establecimos que la medida más apropiada para proteger al acusado de las consecuencias de la violación del Art. 11 por parte del fiscal es ordenándole al fiscal poner a disposición del acusado las declaraciones juradas tomadas por él a los testigos del acusado y prohibiéndole hacer uso de dichas declaraciones. Aun si aceptáramos que para la fecha en que se tomaron las declaraciones juradas las personas interrogadas eran "testigos del acusado" para efectos del Art. 11 (ya hemos visto que el acusado no presentó prueba) del expediente surge que por orden del tribunal de instancia las declaraciones juradas fueron puestas a disposición del acusado y se le prohibió al fiscal hacer uso de ellas. Nada hay en el récord que sostenga que dichas medidas fueran insuficientes para garantizar los derechos del acusado.

El segundo señalamiento de error sostiene que por actuaciones del Ministerio Fiscal se violó el derecho constitucional del acusado a no ser obligado a incriminarse mediante su propio testimonio. Constitución del Estado Libre Asociado de Puerto Rico, Art. II, Sec. 11. Se discute, además, el privilegio

que cubre las comunicaciones entre abogado y cliente. 32 L.P.R.A. sec. 1734(2).

■ En cuanto al derecho constitucional de todo acusado a no ser obligado a incriminarse mediante su propio testimonio, es conveniente señalar que el acusado no prestó testimonio en el proceso seguido contra él. En cuanto a sus conversaciones con los fiscales en el cuartel de la policía los actos del acusado demuestran, no tan solo que fueron voluntarias sino que fue el propio acusado quien insistió en esperar la llegada de los fiscales para contarles lo ocurrido. Ver *Pueblo* v. *Morales Silva*, 99 D.P.R. 477, 483 (1970).

■ Sostiene el acusado que su derecho constitucional a no ser obligado a incriminarse se violó por el Ministerio Fiscal al tomarle una declaración jurada a su secretaria. No le asiste la razón. El citado derecho constitucional es uno personal que prohíbe que se obligue a una persona a testificar en su contra o a presentar y autenticar documentos o efectos personales que puedan incriminarlo. *Andresen* v. *Maryland*, 427 U.S. 463, 475 (1975); *Bellis* v. *United States*, 417 U.S. 85, 88 (1973). No obstante, el derecho a no ser obligado a incriminarse no se extiende para prohibir la presentación de evidencia incriminatoria obtenida sin la necesidad de compeler la cooperación de la persona incriminada. *Fisher* v. *United States*, 425 U.S. 391, 396 (1975); *Couch* v. *United States*, 409 U.S. 322, 328 (1972).

■ El privilegio que cubre las comunicaciones entre abogado y cliente no es aplicable a los hechos del caso de autos. Véanse las expresiones hechas en *Lugo Ortiz* v. *Ferrer*, 85 D.P.R. 862, 871 (1962).[1] No surge de los hechos una relación de abogado y cliente a la cual deba aplicarse el privilegio para fomentar la relación de confianza entre ambos. No existiendo

[1] La Regla 25 de las Reglas de Evidencia de 1979 define la comunicación confidencial que protege este privilegio como "aquella comunicación habida entre un abogado y su cliente en relación a alguna gestión profesional basada en la confianza de que no será divulgada a terceras personas, salvo a aquellas que sea necesario para llevar a efecto los propósitos de la comunicación".

la relación principal, es improcedente invocar el privilegio en su función supletoria respecto a la secretaria del acusado.

El tercer señalamiento de error sostiene que el Fiscal Román interrogó al acusado, entonces sospechoso, sin hacerle las advertencias requeridas por ley, siendo inadmisibles en evidencia las manifestaciones del acusado.

En *Rivera Escuté* v. *Jefe Penitenciaría*, 92 D.P.R. 765, 779 (1965), comentando el caso de *Escobedo* v. *Illinois*, 378 U.S. 478 (1963), señalamos que cuando la investigación de un delito toma el cariz de acusatoria y se posa sobre un sopechoso en particular con miras a sacarle una confesión, cobra realidad el proceso adversativo. "De que sea ya *adversativo* surge la obligación de la policía u otra autoridad competente de advertirle de su derecho constitucional a permanecer en silencio y no incriminarse, y de su derecho a tener allí y entonces asistencia de abogado y el permitirle que la tenga." *Rivera Escuté*, supra. (Énfasis en el original.)

■ La prueba demuestra que el acusado le narró al fiscal su versión de los hechos voluntariamente y bajo circunstancias que no nos permiten revocar la conclusión del tribunal de instancia de que en dicho momento el Fiscal Román no sospechaba que el acusado fuera el autor del crimen. Por tanto, no era necesario hacerle las advertencias al acusado en aquel momento y no cometió error el tribunal de instancia al admitir en evidencia las manifestaciones hechas por el acusado.

El cuarto señalamiento de error sostiene que fue un error de hecho permitir que el Hon. Fiscal Luis A. Román declarara sin que fuera necesario por existir otros testigos de los hechos.

■ En las jurisdicciones estatales, como regla general, se ha determinado que los fiscales pueden testificar aunque se ha reconocido varios conflictos que pueden resultar en determinadas ocasiones. *Annotation: Prosecuting Attorney as a Witness in Criminal Case*, 54 A.L.R.3d 100 (1973).[2]

---

[2]Las Reglas de Evidencia de 1979 no prohíben que los fiscales sirvan como testigos por el hecho de ser fiscales. La anterior Ley de Evidencia tampoco lo prohibía.

En *Pueblo* v. *Flecha*, 70 D.P.R. 685 (1949), señalamos en un escolio que el doble papel de fiscal y testigo debe evitarse porque el jurado tiende a conceder más peso a la declaración de un fiscal que a la declaración de un testigo corriente.

■ Como autoridad para el anterior aserto citamos a *Robinson* v. *United States*, 32 F.2d 505 (8th Cir. 1928). Una lectura de dicho caso revela que lo que se aconseja para evitar el mal que se apunta es que el fiscal que testifica no participe en el juicio. Ver además *United States* v. *Pepe*, 247 F.2d 838–844 (2d Cir. 1957); 54 A.L.R.3d, *supra*, a la pág. 118. Precisamente eso fue lo que ocurrió en el presente caso. El Fiscal Román fue fiscal-investigador y participó en los procedimientos de determinación de causa probable y fijación de fianza, pero en la vista del caso ante el Tribunal Superior de San Juan el Ministerio Fiscal estuvo representado por los fiscales Esteban de Jesús y Héctor Rivera Cruz. Además, al renunciar el acusado voluntariamente al derecho a juicio por jurado, y al derecho de presentar testigos en su favor, desaparece el problema señalado en *Pueblo* v. *Flecha*, supra, sobre la credibilidad que pueda merecerle al jurado el testimonio del fiscal frente al testimonio de un testigo corriente. *People* v. *Superior Ct. of San Luis Obispo Cty.*, App. 148 Cal. Rptr. 704, 710 (1978).

En vista de lo anterior concluimos que en el caso de autos, la declaración del Fiscal Román no privó al acusado de un juicio justo e imparcial.

■ El quinto apuntamiento sostiene que fue un error trasladar el caso al Tribunal Superior de San Juan. No se cometió el error señalado. La cláusula constitucional que garantiza el derecho a juicio por jurado imparcial compuesto por 12 vecinos del distrito no impide el traslado de ciertos casos a otros distritos.(3) Las Reglas 27 y 81 de las Reglas de Procedimiento Criminal de 1963 claramente contemplan el

---

(3)Véase la discusión sobre la Sec. 11 del Art. II de nuestra Constitución en el *Diario de Sesiones de la Convención Constituyente*, T. 3, págs. 1592–93.

traslado y disponen los fundamentos que pueden aducirse para solicitar el mismo.

En el caso de autos los apelantes sostienen que la publicidad que tuvo el caso perjudicó al acusado y evitó que se celebrara un juicio imparcial. El hecho de un caso recibir mayor publicidad no establece por sí solo la comisión de un error en el juicio ni crea automáticamente prejuicio en contra del acusado. Véase lo expresado en *Pueblo* v. *Dumas*, 82 D.P.R. 416 (1961) y *Pueblo* v. *Pérez Santaliz*, 105 D.P.R. 10 (1976). Se ha reconocido generalmente que las consecuencias adversas que puede tener la publicidad se contrarrestan considerablemente cuando el juicio se celebra en un área metropolitana populosa. *People* v. *Manson*, 132 Cal. Rptr. 265, 319 (1976).

Bajo los hechos del caso de autos, actuó correctamente el tribunal de instancia al trasladar el juicio al distrito judicial de San Juan para contrarrestar los posibles efectos adversos de la publicidad.

El sexto señalamiento de error sostiene que un análisis sereno y jurídico de las pruebas aportadas no establece la culpabilidad del acusado por el delito de asesinato en primer grado más allá de toda duda razonable. El relato que hemos hecho de la prueba desvirtúa este apuntamiento.

*Se confirman las sentencias apeladas.*

Los Jueces Asociados Señores Irizarry Yunqué y Negrón García no intervinieron.