EL PUEBLO DE PUERTO RICO en interés del menor J.A.B.C., apelante.

*Número:* CE-87-108 *Resuelto:* 11 de abril de 1989

552

*Luis Ángel López Olmedo*, abogado del apelante; *Norma Cotti Cruz, Subprocuradora General, Miriam Álvarez Archilla* y *Marjorie Rivera Rodríguez, Procuradoras Generales Auxiliares*, abogadas de El Pueblo.

EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ emitió la opinión del Tribunal.

En horas de la noche de 14 de febrero de 1986 —frente al Núm. 268 de la Calle Fajardo, Barrio Obrero, Santurce, Puerto Rico— fue ultimado de varios disparos de arma de

fuego el ciudadano Israel Rodríguez Serrano. La autopsia que fuera practicada en el cuerpo del referido occiso, por uno de los patólogos forenses del Instituto de Medicina Legal del Recinto de Ciencias Médicas de la Universidad de Puerto Rico, reveló que el cuerpo del mencionado ciudadano fue blanco de nueve (9) proyectiles de bala, certificándose como causa de la muerte un "severo trauma cráneo-cerebral y laceración de órganos internos por heridas de bala".

En relación a dichos hechos fue encausado el menor de diez y seis (16) años de edad J.A.B.C. ante el Tribunal Superior de Puerto Rico, Sala de Asuntos de Menores de San Juan. Luego de la correspondiente vista en sus méritos, dicho tribunal encontró "incurso al menor" en las faltas imputadas por los delitos de asesinato e infracción a los Arts. 6 y 8 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. secs. 416 y 418, "entregando su custodia al Departamento de Servicios Sociales . . .". En apelación, se le imputa al tribunal de instancia haber incurrido en los siguientes errores:

1. Que se tomó una confesión al menor sin la asistencia de abogado, incriminatoria sobre los delitos imputados.
2. Que no se le hicieron las advertencias de ley correspondientes sobre asistencia de abogado, sino hasta que se tomó dicha confesión entregándosele incluso un documento en blanco sobre las advertencias de ley.
3. Que las citadas advertencias de haberse hecho fueron una violación a sus derechos constitucionales y civiles.
4. Que la citada confesión fue tomada ilegalmente y en contra de sus derechos constitucionales y civiles.
5. Que erró el Tribunal de Instancia al admitir en evidencia dicha confesión y documento sobre advertencias de ley hechas al menor en violación a sus derechos constitucionales y civiles.
6. Que la confesión prestada de haber sido admisible, no fue corroborada por prueba alguna de conformidad con los criterios establecidos por el Honorable Tribunal Supremo de Puerto Rico.

7. Que del conjunto de circunstancias del caso, ha habido una violación crasa de los derechos constitucionales y civiles del menor que amerita se revoque la sentencia con resolución dictada. Alegato, págs. 7–8.

Como podemos notar, no obstante lo "numeroso" de los señalamientos, los mismos se pueden sintetizar en que el tribunal de instancia cometió grave error de derecho al admitir en evidencia una "confesión", alegadamente brindada por el menor apelante a agentes de la Policía de Puerto Rico, sin que se le hubieran hecho a éste, con anterioridad al momento de la "confesión", las "advertencias de ley" requeridas por la doctrina imperante en esta jurisdicción y sin que dicho menor estuviera, al momento de brindar la confesión, asistido de abogado. En segundo lugar, se alega que el foro de instancia erró al declarar "incurso" al apelante en las faltas imputadas en vista de que la referida confesión —única prueba inculpatoria— no fue "corroborada" según lo exige la jurisprudencia de este Tribunal.

No le asiste la razón. Procede confirmar la determinación del tribunal de instancia. Veamos por qué.

## I

Conforme el "resumen de la prueba" preparado por la representación legal del menor apelante, certificado como correcto por el tribunal de instancia, en horas de la tarde de 7 de marzo de 1986 se personó al Cuartel de la Policía de Barrio Obrero la Sra. Iris Valeska Castro, dama a la cual el sargento de turno en dicho cuartel conocía por razón de que ella había acudido al mismo en ocasiones anteriores en relación con incidentes de agresión de que había sido víctima de parte de Rodríguez Serrano, persona con quien sostenía relaciones amorosas. Según surge del referido resumen, el Sargento Albino González:

. . . notó a la señora intranquila como un poco nerviosa, con deseos de decir algo y no se atrevía[,] y siguió dialogando con esta señora hasta que ella le manifiesta que quería el número de querella *porque tenía un problema. [É]l preguntó cu[á]l, y ella dice que el problema es que su hijo había matado a su esposo. Esta manifestación la hace ella libre y voluntariamente.* En el diálogo después de la pregunta de que para qué quiere la querella[,] ella lo manifiesta así, sin hostigamiento de su parte[,] le indica que su hijo está en esa situación y que ella quiere ayudarlo. *[É]l le manifiesta que la mejor manera de ayudarlo es entregándolo. En base a eso logró que ella lo entregara.* Fue a la casa de su hijo, del abuelito que estaba allí, el menor estaba durmiendo en una cama. Se identificó como Sargento de la Policía[,] que estaba allí con relación al problema que el menor tenía[;] esperó que se vistiera. *Lo llevó al Cuartel [y] le dió conocimiento al agente de policía Guzmán. Este se presentó con Laguerre y allí en la oficina del Capitán le hizo entrega a Guzmán del menor.*

Durante el transcurso del trayecto de la casa del menor hasta el Cuartel en ningún momento le hizo preguntas al menor ni tiene acceso a éste con relación al caso. *No le hace las advertencias porque no era necesario ya que él no hizo ninguna pregunta que lo incrimine con relación al caso.* Lo único que hace es llevarlo al Cuartel y allí se las entiende con Laguerre y Guzmán en la oficina del Capitán . . . . (Énfasis suplido.) Resumen del procedimiento, pág. 11.

Los agentes Guzmán y Laguerre —sin entrevistar ni a la señora Castro ni a su hijo— procedieron a llevar a éstos al Cuartel General de la Policía. Una vez allí, el agente Guzmán *procedió a leerle al menor apelante* —estando presente la madre— *las "advertencias de ley" de un "documento formulario"* que a esos fines tiene la Policía de Puerto Rico.([1]) *Luego de preguntarle si habían entendido las mismas y recibir contestación en la afirmativa de parte del menor y su mamá —los cuales se encontraban "tranquilos"—*([2]) *tanto*

---

([1]) *Exhibit* I del Estado, pág. 7.

([2]) Véase, a esos efectos, las págs. 6 y 7 del resumen del procedimiento.

*el menor apelante como su señora madre y el agente Guz-*
*mán procedieron a firmar dicho documento.* El mismo lee:

ESTADO LIBRE ASOCIADO DE PUERTO RICO
POLICIA DE PUERTO RICO

A D V E R T E N C I A S

Advertencias hechas a (el - la) menor de edad _____
Warnings done to the minor

_____[J.A.B.C.]_____ residente en _____Calle_____
 resident in

Gautier Benítez 656 Bo. Obrero _____ en presencia de
 in presence of

Iris Valeska Castro Arg[ü]elles _____ por la alegada
 due the following

"FALTA O DELITO" Asesinato [en] Primer Grado[,] 6 y 8
alleged fault

Ley [de] Armas. Estas advertencias le fueron ampliamente
 These warnings where fully explained to
explicadas:
these m[i]nor:

1. Usted tiene el derecho a permanecer callado y a no decla-
 rar.
 You have the right to remain silent when questioned.
2. Cualquier cosa que usted, diga, puede ser usado en su con-
 tra.
 Anything you say may be used in court against you.
3. Usted tiene el derecho a hablar con un abogado para que le
 aconseje antes de yo hacerle cualquier pregunta y además
 dicho abogado puede acompañarle durante el interrogato-
 rio.
 You have the right to counsel, to talk with counsellor before
 saying anything and to have counsellor present during
 questioning.
4. Si usted no puede pagar un abogado, le conseguiré uno
 antes de interrogarlo, libre de costo alguno, si así lo desea.
 If you are indigent and if you wish I will get you a lawyer
 prior to questioning, without charge.

5. Si usted decide contestar mis preguntas sin estar asistido de un abogado, puede negarse a contestar cualquier pregunta y solicitar asistencia legal.

 If you desire to answer my questions without legal assistance you can invoke your right to remain silent at any time and can request for counsel.

6. Su declaración tiene que ser libre, voluntaria y espontánea y no se puede ejercer ninguna presión, ni amenaza, ni coacción o intimidación para obligarlo a declarar.

 Your stat[e]ment must be completly free, voluntary and spontaneous and I can not use any degree of persuasion, threat, coercion or intimidation to force you to answer.

¿Ha entendido lo que le he explicado?
Have you unde[r]stood what I have explained to you?

¿Desea usted declarar?
Are you willing to testify?

Enterado __[J.A.B.C.]__ [fdo.]
Aquainted

Testigo __Iris Valeska Castro Argüelles__ [fdo.]
Witness

Agte. José A. Guzmán De León 6827
 Funcionario que lee y explica advertencias

José A. Guzmán De León [7 marzo 1986]. Apéndice, pág. 1.(3)
 [Firma] [Fecha]

Conforme el testimonio del agente Guzmán —el cual le mereció entero crédito al tribunal de instancia— luego de que todos firmaron el referido documento, *él le preguntó al menor apelante si interesaba la asistencia de un abogado. Éste contestó en la negativa, expresando "que estaba su mamá, que estaba bien . . .".* Informe del Procurador General, pág. 3.(4) Luego de ello, el menor apelante procedió a

---

(3) En las dos ocasiones en que aparece el nombre del menor en el documento original, el mismo aparece en forma completa. Al transcribir dicho documento se ha omitido la firma y el nombre completo del menor para mantener la confidencialidad de la identidad del menor.

(4) Véase pág. 6 del resumen del procedimiento.

relatarle al agente Guzmán lo ocurrido en la noche de 14 de febrero de 1986. *Mientras el menor declaraba, el agente del orden público fue tomando notas*; las mismas fueron admitidas en evidencia durante la vista celebrada ante el tribunal de instancia.(5) *Dichos "apuntes" fueron, igualmente, firmados por el menor apelante, su mamá y el agente Guzmán.* Según el testimonio del referido funcionario el menor apelante le relató, en síntesis y en lo pertinente, que él desaprobaba las relaciones amorosas que sostenía su señora madre con Rodríguez Serrano, por razón de que éste la agredía; que en la noche de 14 de febrero él llegó a casa de su madre —sita en el Núm. 268 de la Calle Fajardo de Barrio Obrero— encontrando a Rodríguez Serrano sentado en su automóvil, esperando por su madre; que luego de intercambiar unas palabras con éste, y al acercarse su madre al sitio, él disparó en seis ocasiones hacia el interior del carro donde se encontraba aquél; que volvió a cargar el revólver y le hizo seis disparos más a Rodríguez Serrano quien se encontraba, en esos momentos, herido pero fuera del carro; que luego de ello se fue, botó el revólver en la "laguna", y se fue a dormir a casa de su abuelo con quien residía.

Declaró el agente Guzmán, por último, que luego de que el menor "confesara", él lo condujo a la División de Ayuda Juvenil de la Policía con el propósito de que se sometiera el caso ante el Tribunal Tutelar de Menores. Ello no se pudo hacer en dicho día, *por lo que el menor apelante fue dejado en libertad y citado para el día siguiente*, cuando finalmente se sometió el caso ante un magistrado.

La señora Castro, madre del menor apelante, prestó testimonio ante el tribunal de instancia. Negó enfáticamente que el agente Guzmán le hubiera hecho las "advertencias de ley" a su hijo. *Aceptó, sin embargo, que tanto ella como su*

---

(5) *Exhibit* II del Estado.

*hijo firmaron el documento donde aparecen dichas "adver-
tencias"*; alegó que lo firmaron "en blanco". *Reconoció,
igualmente, su firma en las "notas o apuntes" que tomó el
agente Guzmán mientras su hijo declaraba.* Declaró por úl-
timo que, no obstante no haber sido testigo presencial de los
hechos que precedieron a la muerte de su amigo Rodríguez
Serrano, *ella vió esa noche el cuerpo "abaleado" del occiso
frente a su casa.*

## II

No debe haber la menor duda de que el derecho
que tiene todo ciudadano que habita en nuestro país, ante
una imputación de delito por parte del Estado a permanecer
callado, a no incriminarse y a que su silencio no pueda ser
tomado en su contra —garantizado el mismo por el Art. II,
Sec. 11, Const. E.L.A., L.P.R.A., Tomo 1— es uno de los de-
rechos más trascendentales y fundamentales del derecho pe-
nal y procedimiento criminal que se practica en una demo-
cracia como la nuestra. Debido a ello es que las manifesta-
ciones inculpatorias que realiza un sospechoso, sobre el cual
se ha centralizado una investigación criminal o un imputado
de delito, *únicamente* son admisibles en evidencia cuando el
Estado demuestra que dichas manifestaciones fueron prece-
didas por una *renuncia voluntaria, consciente, e inteligente*
del derecho contra la autoincriminación. *Miranda v. Ari-
zona,* 384 U.S. 436, 444, 475 (1966); *Moran v. Burbine,* 475
U.S. 412, 421 (1986).

Una renuncia del mencionado derecho es "voluntaria"
cuando la misma es realizada sin que haya mediado intimida-
ción, coacción o violencia por parte de los funcionarios del
Estado en el procedimiento que culmina en la toma de la
confesión. *Colorado v. Connelly,* 479 U.S. 157 (1986).

Por otro lado, y en palabras del Tribunal Supremo fede-
ral, una renuncia de esta naturaleza puede ser considerada
como una "consciente e inteligentemente" realizada cuando

el sospechoso o imputado de delito es informado, en forma apropiada, del privilegio constitucional contra la autoincriminación; incluyendo *la advertencia crucial* de que cualquier manifestación que haga al respecto podrá ser usada en su contra en un proceso criminal. *Colorado v. Spring,* 107 S. Ct. 851 (1987).

 Un análisis de nuestra jurisprudencia revela que hemos exigido —para que una renuncia al derecho constitucional contra la autoincriminación se considere como una realizada en forma "consciente e inteligente"— que el Estado le informe, de manera eficaz,[6] al sospechoso o imputado de delito las siguientes advertencias: que tiene el derecho a permanecer callado; que cualquier manifestación que haga podrá ser utilizada como evidencia en su contra; que tiene el derecho a consultar con un abogado de su selección antes de decidir si declara o no y contar con la asistencia de éste durante el interrogatorio, y que de no tener dinero para pagar un abogado, el Estado viene en la obligación de proveérselo. *Rivera Escuté v. Jefe Penitenciaría,* 92 D.P.R. 765 (1965); *Pueblo v. De Jesús Cabrera,* 94 D.P.R. 450 (1967); *Pueblo v. Chaar Cacho,* 109 D.P.R. 316 (1980); *Pueblo v. Ríos Álvarez,* 112 D.P.R. 92 (1982); *Pueblo v. Cabán Torres,* 117 D.P.R. 645 (1986).

 A los fines de determinar si esa renuncia al derecho contra la autoincriminación es o no una válida en derecho, los tribunales deben examinar la "totalidad de las circunstancias" que rodearon la confesión obtenida por los funcionarios del Estado. En palabras del Tribunal Supremo de Estados Unidos, en *Moran v. Burbine,* ante, pág. 421:

---

[6] Los funcionarios del Estado no cumplen con su obligación de informarle al sospechoso o acusado de su derecho contra la autoincriminación en una "forma eficaz", haciendo dichas advertencias en *forma mecánica* con el único propósito de cumplir con el requisito de las advertencias. *Pueblo ex rel. F.B.M.,* 112 D.P.R. 250, 252 (1982); *Rivera Escuté v. Jefe Penitenciaría,* 92 D.P.R. 765 (1965).

Echoing the standard first articulated in *Johnson* v. *Zerbst*, 304 U.S. 458, 464 (1983), *Miranda* holds that "[t]he defendant may waive effectuation" of the rights conveyed in the warnings "provided the waiver is made voluntarily, knowingly and intelligently." 384 U.S., at 444, 475. The inquiry has two distinct dimensions. *Edwards* v. *Arizona, supra,* at 482; *Brewer* v. *Williams,* 430 U.S. 387, 404 (1977). First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived. Fare* v. *Michael C.,* 442 U.S. 707, 725 (1979). See also *North Carolina* v. *Butler,* 441 U.S. 369, 374–375 (1979). (Énfasis suplido.)[7]

Por último, y en relación con los hechos específicos del caso ante nuestra consideración, procede que se señale que el Tribunal Supremo federal ha entendido procedente "extender" o aplicar el referido criterio de la "totalidad de las circunstancias" a casos en que están envueltos menores de edad. En *Fare v. Michael C.,* 442 U.S. 707, 725 (1979), dicho Foro expresó, en lo pertinente, que:

This *totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved.* We discern no persuasive

---

(7) Entre los muchos factores que deben ser sopesados por los tribunales bajo el mencionado criterio de la "totalidad de las circunstancias", con el propósito de determinar la admisibilidad o inadmisibilidad de la confesión, se encuentran: (1) la persona del sospechoso o imputado de delito y sus circunstancias personales y particulares; esto es, su edad, su instrucción académica, etc.; (2) el período de tiempo que estuvo bajo custodia policíaca antes de prestar la confesión; (3) si estuvo o no acompañado por un familiar; (4) si efectivamente estuvo o no asistido por abogado al confesar; etc. *Rivera Escuté v. Jefe Penitenciaría,* ante; *Fare v. Michael C.,* 442 U.S. 707 (1979).

reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so. *The totality approach permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation.* This includes evaluation of the juvenile's *age, experience, education, background,* and *intelligence,* and into whether he has the *capacity to understand* the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights. See *North Carolina* v. *Butler, supra.* (Énfasis suplido.)

■ Por nuestra parte hemos resuelto —en adición, naturalmente, a sostener que "a un menor le protege en todo momento la garantía constitucional contra la autoincriminación . . .", *R.A.M.* v. *Tribunal Superior,* 102 D.P.R. 270, 273 (1974)— que hay que "intentar asegurarse" si la confesión prestada por el menor "es en verdad voluntaria" (*Pueblo ex rel. F.B.M.,* 112 D.P.R. 250, 252 (1982)) —ello "no sólo en el sentido de que no fue el producto de la coacción o la sugestión, sino también en el sentido de que no fue el resultado de la ignorancia de sus derechos o de la fantasía, el pavor o el desaliento del adolescente"—([8]) mediante "el examen de la *totalidad de las circunstancias* en que la confesión" se produjo. (Énfasis suplido.) *Pueblo ex rel. F.B.M.,* ante, pág. 252.([9])

### III

■ La alegación o señalamiento del menor apelante a los efectos de que los agentes del orden público que intervinieron con él no le hicieron las "advertencias de ley" hasta

---

([8]) Citado y transcrito al español de *In re Gault,* 387 U.S. 1, 55 (1967).

([9]) Esa determinación del juez, conforme el criterio de la "totalidad de las circunstancias", es una a ser realizada, naturalmente, en la *etapa judicial* de los procedimientos. Esto es, las disposiciones del Art. 11 de la vigente Ley de Menores de Puerto Rico, 34 L.P.R.A. sec. 2211, *no* deben ser interpretadas como que requieren la presencia e intervención del magistrado, a esos propósitos y efectos, en la *etapa investigativa* del caso.

después que él había confesado, es completamente inmeritorio. La prueba presentada a nivel de instancia —según la misma surge del "resumen de la prueba" preparado por la representación legal del propio apelante y certificada como correcta por el tribunal de instancia— sostiene ampliamente la determinación de que dichas "advertencias" le fueron hechas al menor apelante *con anterioridad* al momento en que éste confesó —véase, a esos efectos, *Pueblo v. Figueroa González*, 95 D.P.R. 98, 104 (1967)— en cumplimiento de las disposiciones de la Regla 2.7 de Procedimiento para Asuntos de Menores, 34 L.P.R.A. Ap. I-A.[10] Siendo ello así, no tenemos base alguna para intervenir con la apreciación de la prueba que, en relación con ese hecho, realizara el foro de instancia. *Pueblo v. Cabán Torres*, ante.[11]

Procede que se señale, por otro lado, que el hecho de si la confesión prestada por el menor fue o no "voluntaria" *no* está en controversia. Aparte de que ello no se plantea ni se reclama por el apelante, no hay un sólo ápice de prueba en el récord que ni tan siquiera sugiera que éste fuera objeto en algún momento de coacción, violencia o intimidación de parte de los agentes de la Policía de Puerto Rico que intervinieron con él en relación con los hechos del presente caso. Todo lo contrario; si algo demuestra el récord lo es que el menor fue tratado en todo momento con gran respeto y consideración

---

[10] Dicha disposición reglamentaria establece:

"El funcionario del orden público que efectúe la aprehensión de un menor deberá advertir a éste y a sus padres o encargados, si están disponibles, del derecho del menor a permanecer en silencio con relación a los hechos que motivan su aprehensión, a no incriminarse y a comunicarse con un abogado. Además explicará al menor, sus padres o encargados del deber de mantener al tribunal informado de cualquier cambio de dirección residencial y postal." 34 L.P.R.A. Ap. I-A, R. 2.7.

[11] La declaración prestada por la señora Castro, madre del apelante, respecto a este punto fue a los efectos de que tanto su hijo como ella firmaron un papel "en blanco". Dicho testimonio es completamente inverosímil. Como hemos visto, el documento en cuestión es un formulario impreso que difícilmente puede ser catalogado como uno "en blanco".

por dichos funcionarios públicos. La mejor evidencia de ello lo constituye el hecho de que el menor, al no poderse someter el caso ante un magistrado el día en que prestó la confesión, fue dejado en libertad y éste regresó voluntariamente al otro día para que ello se pudiera llevar a cabo.

Nos resta por resolver, naturalmente, si dicha confesión fue prestada "consciente e inteligentemente" por el menor apelante. Esto es, si la prueba presentada demuestra que la renuncia que dicho menor hiciera de su derecho contra la autoincriminación fue una hecha luego de que fuera informado, en forma apropiada y eficaz por los funcionarios del Estado, de ese derecho y de las consecuencias que conllevaba renunciar al mismo, y que el menor entendió o comprendió dichas advertencias. *Miranda v. Arizona*, ante; *Moran v. Burbine*, ante; *Fare v. Michael C.*, ante; *Rivera Escuté v. Jefe Penitenciaría*, ante.

Un análisis de la "totalidad de las circunstancias" que rodearon la toma de la confesión aquí en controversia, nos lleva a concluir que efectivamente el Estado demostró que la mencionada confesión fue precedida por una renuncia "consciente e inteligente" por parte del menor apelante de su derecho constitucional contra la autoincriminación. *Pueblo ex rel. F.B.M.*, ante. De entrada, procede enfatizar el hecho de que el documento-formulario utilizado por los agentes del orden público en el presente caso —el contenido del cual le fue leído al menor apelante por el agente Guzmán— contiene todas y cada una de las "advertencias" que exige nuestra jurisprudencia en esta clase de situaciones. *Rivera Escuté v. Jefe Penitenciaría*, ante; *Pueblo v. De Jesús Cabrera*, ante; *Pueblo v. Chaar Cacho*, ante; *Pueblo v. Ríos Álvarez*, ante; *Pueblo ex rel. F.B.M.*, ante. En segundo lugar, aun cuando se trataba de un menor de edad, éste no se encon-

traba solo ante los agentes del Estado. Su señora madre estuvo, *en todo momento*, junto a él.[12] Por otro lado, y según surge del resumen de la prueba, los agentes *específicamente le preguntaron* al menor si había entendido las "advertencias" que se le habían hecho, contestando éste en la afirmativa, y si interesaba la asistencia de un abogado, a lo que el menor respondió en la negativa por razón de que estaba su señora madre presente. En cuarto lugar, no debe perderse de vista que en el presente caso *no* se trata del sospechoso o imputado de delito que confiesa al encontrarse en contra de su voluntad (arrestado) bajo custodia policíaca. En el presente caso el menor apelante, luego de un "acercamiento" de parte de su señora madre, accedió voluntariamente a acompañar a los agentes del orden público al Cuartel de la Policía. Ese dato, unido al hecho de que el menor y su señora madre firmaron tanto el documento de las "advertencias" como las notas que de la confesión tomara el agente Guzmán, y al hecho adicional de que luego de que el menor fuera dejado "en libertad" el día 7 de marzo de 1986 éste regresó voluntariamente al otro día con el propósito de que se sometiera el caso ante un magistrado, nos convence de que realmente se trata de una confesión "consciente e inteligentemente" realizada y no una producto de la coacción o sugestión ni el resultado de la ignorancia de sus derechos o de la fantasía, el pavor o el desaliento. *Pueblo ex rel. F.B.M.*, ante.[13]

---

[12] En *Pueblo ex rel. F.B.M.*, ante, pág. 253, al resolver que era inadmisible en evidencia la alegada admisión hecha por el menor allí envuelto, le concedimos gran importancia al hecho de que en el momento en que alegadamente el menor la había hecho, no había presente ningún familiar de éste o un adulto interesado en el bienestar del mismo "capaz de explicarle el alcance de la renuncia a sus derechos".

[13] El hecho de que el menor apelante, con anterioridad a prestar su declaración, efectivamente no tuviera asistencia de abogado, no derrota la conclusión a la que llegamos.

Aun cuando la presencia o ausencia de abogado en la toma de una confesión es factor importante en la determinación que tiene que hacer un tribunal sobre si

## IV

Alega, en adición, el apelante que procede la revocación de la determinación del tribunal de instancia encontrándole incurso en las faltas imputadas, por el fundamento de que la confesión prestada "no fue corroborada por prueba alguna" de conformidad con la jurisprudencia sobre la materia vigente en nuestra jurisdicción.[14] El error es obviamente inmeritorio.

Recientemente —en *Pueblo v. Fradera Olmo*, 122 D.P.R. 67 (1988)— tuvimos la oportunidad de considerar y resolver un planteamiento similar. En dicho caso, el apelante le había confesado o admitido a su hermano —única prueba que lo "conectaba" con los hechos imputádoles de asesinato— que con el propósito de robarle al occiso, le había dado unos golpes a éste dejándolo tirado en determinado lugar. Al rechazar el planteamiento de error a los efectos de que el Estado no había presentado prueba independiente que corroborara dicha confesión, expresamos en lo pertinente que:

> En nuestra jurisprudencia está firmemente establecida la llamada doctrina de corroboración del *corpus delicti*. Ésta requiere que las confesiones o admisiones en casos criminales sean corroboradas con prueba independiente. El propósito de la doctrina es proteger al acusado de confesiones o admisiones

---

la renuncia del derecho constitucional contra la autoincriminación fue una hecha en forma "consciente e inteligente", *el mismo no es uno determinante.*

De ordinario, *la presencia* del abogado en la toma de la confesión es una garantía de que dicha renuncia efectivamente fue una "inteligente y conscientemente" realizada.

Por otro lado, *la ausencia* de abogado *no* hace, naturalmente, que dicha renuncia sea inválida per se. En esta clase de situaciones, los tribunales deberán examinar con más cuidado y detenimiento la "totalidad de las circunstancias" que rodearon la renuncia del citado derecho constitucional, con el propósito de resolver la interrogante de si ésta fue llevada a cabo en forma "consciente e inteligente". *Rivera Escuté v. Jefe Penitenciaría*, ante; *Pueblo ex rel. F.B.M.*, ante.

[14] Véanse: *Pueblo v. Pérez Fernández*, 95 D.P.R. 919 (1968); *Pueblo ex rel. F.B.M.*, ante, pág. 254.

falsas. La doctrina de corroboración requiere que la confesión de un acusado sea corroborada con prueba *aliunde* que tienda a establecer el *corpus delicti*.

En *Pueblo v. Hernández*, supra, pág. 916, definimos la prueba del *corpus delicti* como aquella que demuestre: "(1) que se ha sufrido una pérdida o daño específico, y (2) que dicha pérdida o daño específico fué ocasionada por un agente criminal".

Posteriormente, fuimos más explícitos en cuanto a la implantación de la doctrina de corroboración del *corpus delicti* en las confesiones. En *Pueblo v. Campos Suárez*, supra, pág. 311, señalamos que "'[l]a evidencia de corroboración no tiene que ser suficiente, independientemente de las admisiones o manifestaciones para establecer el corpus delicti; es suficiente si la evidencia de corroboración tiende a *sostener los elementos esenciales admitidos* por el acusado en forma tal que justifique la determinación de su veracidad por un jurado'". (Énfasis nuestro.) Citando a *Martínez v. United States*, 295 F.2d 426 (10mo Cir. 1961).

Luego en *Pueblo v. Pérez Hernández*, 95 D.P.R. 919 (1968), reiteramos lo establecido en *Pueblo v. Campos Suárez*, supra, y añadimos que "[l]o que se requiere es que El Pueblo traiga evidencia sustancial independiente que tienda a establecer la *veracidad* de las admisiones". (Énfasis nuestro.) *Pueblo v. Pérez Hernández*, supra, pág. 922. También hicimos constar que no era necesario que la evidencia corroborativa estableciera la culpabilidad del acusado fuera de toda duda razonable, que evidencia circunstancial podría ser suficiente corroboración y que, cuando hay alguna evidencia *aliunde* tendiente a establecer el *corpus delicti*, la admisión podría ser considerada en relación con esa evidencia para establecer el *corpus delicti*. . . .

En el caso de autos, la prueba de corroboración presentada consistió en que los bolsillos del pantalón del occiso estaban al revés, que la víctima murió debido a golpes causados con un objeto contundente, que había sangre alrededor del cuerpo y que el occiso fue encontrado a unos veinte (20) pies de un camino vecinal. Ciertamente esta prueba tiende a corroborar o sostener elementos esenciales admitidos por el acusado en la confesión, tales como que éste "había ido allá abajo y que . . . había agolpeado [sic] [a la víctima] y después que le buscó los bolsillos se fue y que se le había ido la mano y que Sencio [sic]

[la víctima] se había quedado allí donde cayó". A la luz de la prueba de corroboración presentada, podemos inferir la *veracidad* de la confesión que el acusado apelante le hizo a su hermano Áxel. *Pueblo v. Pérez Hernández*, supra. (Citas omitidas, énfasis en el original y escolio omitido.) *Pueblo v. Fradera Olmo*, ante, págs. 73–75.

A la luz de lo resuelto en el citado caso de *Pueblo v. Fradera Olmo*, ante, resulta evidente que el Estado presentó prueba independiente suficiente que tiende a corroborar el *corpus delicti*, a sostener los elementos esenciales admitidos por el apelante en su confesión y la veracidad de la misma. Basta para ello el testimonio prestado por la madre del apelante en la vista celebrada ante el foro de instancia a los efectos de que ella observó, en la noche de 14 de febrero de 1986, el cuerpo abaleado del occiso, el cual yacía en el pavimento, al lado de su automóvil, frente a la residencia de ella sita en el Núm. 268 de la Calle Fajardo, Barrio Obrero, Santurce, Puerto Rico.

En el presente caso, de hecho, se puede afirmar sin temor de equivocación que existe prueba suficiente en el récord para sostener la corroboración de la confesión prestada por el menor apelante bajo la "teoría de la confiabilidad" (*trustworthiness*) o veracidad de la confesión,(15) teoría que rige en la jurisdicción federal desde que se resolvió el caso de *Opper v. United States*, 348 U.S. 84 (1954), y que algunos comentaristas favorecen sobre la teoría de la corroboración del *corpus delicti*. Véase E.W. Clearly, *McCormick on Evidence*, 3ra ed., Minnesota, Ed. West Publishing Co., 1984, pág. 371.

Por las razones antes expresadas, *se dictará sentencia confirmando la resolución del tribunal de instancia, encontrando incurso al menor apelante en las faltas imputádales.*

---

(15) A estos efectos, basta recordar que tanto el menor apelante como su señora madre firmaron "los apuntes o notas" que tomó el agente Guzmán de la confesión prestada por él. De dichos apuntes se desprende la misma versión que brindara el agente Guzmán durante la vista celebrada.