*1008 TEXTO COMPLETO DE LA SENTENCIA
I
Por hechos ocurridos el 28 de julio de 2006, el apelante Wilfredo Morales fue acusado por un cargo de asesinato en primer grado bajo el Artículo 106 del Código Penal de Puerto Rico, 33 L.P.R.A. see. 4734, y un cargo por infracción al Artículo 5.05 de la Ley de Armas, 25 L.P.R.A. sec. 458(d) (Supl. 2008), por uso de un arma blanca.
Al apelante se le imputó ocasionar la muerte de Jorge Flores mediante el uso de un bate de béisbol.
Luego de otros trámites, se celebró un juicio ante jurado del 12 de junio de 2007 al 28 de junio del mismo año. A base de la prueba desfilada, el jurado declaró culpable al apelante de los delitos imputados.
El 20 de junio de 2007, el Tribunal de Primera Instancia sentenció al apelante a cumplir penas consecutivas de 99 años de cárcel por el asesinato de Jorge Flores y 6 años por la violación a la Ley de Armas.
Insatisfecho, el apelante acudió ante este foro.
II
La prueba desfilada por el Ministerio Público consistió en los testimonios de Armando Gómez, Pablo Gómez, José Valentín, Sheryl De Jesús, Luis Flores y Jorge Del Morán, los agentes de la Policía Ramón Martínez, Luis Meléndez y Carlos Sustache, la agente Lisa Torres y los empleados del Instituto de Ciencias Forenses María Matos, María Hernández, Murphy Rivera y Benjamín Acosta.
Armando Gómez declaró que él es estudiante universitario y vive en el Barrio de Quebradillas de Yabucoa. El día de los hechos, como a las 10:30 p.m., estaba en su cuarto viendo televisión. Escuchó un carro que entró chillando gomas a la entrada de su casa. Vio el carro de la víctima. Conocía el carro, porque la víctima era como de la familia de ellos. Salió de su cuarto y escuchó unos ruidos fuertes, como cuando uno le da a un pedazo de carne vacía. Observó a un hombre con pantalones cortos y tenis que tenía un bate en la mano derecha, que estaba llegando al solar de su casa. Se asomó y vio la víctima tirada en el piso al lado de su carro. Lo tocó y se dio cuenta que estaba muerto. El cuerpo estaba boca abajo, lleno de sangre y de golpes. El subió y llamó al 911. Le avisó a su papá, quien llamó a la Policía.
*1009 En el contrainteroorgatorio, declaró que oyó un vehículo chillando gomas, no escuchó frenazos ni sonidos de un carro chocando con otro. No escuchó a nadie peleando ni discutiendo. No vio a nadie pegarle a la víctima. Tampoco observó a más nadie, aparte del de los pantalones cortos. La persona que vio en pantalones cortos, estaba caminando por la carretera de la casa, de espaldas. El sitio estaba bastante oscuro y la persona era trigueña. En el lugar de los hechos no observó a ninguna joven. La Policía llegó y él se entrevistó con el agente Martínez.
Pablo Gómez Álvarez declaró que tenía 51 años y que trabajaba en la Autoridad de Acueductos y Alcantarillados. El día de los hechos, como a las 10:30 p.m., estaba en su casa viendo televisión cuando oyó llegar un vehículo a su casa. Pensó que era uno de sus hijos. Su hijo Armando le dijo que le estaban dando a la víctima. Salió de la casa, vio el carro estacionado al frente y a la víctima tirado en el piso ensangrentado. Llamó al cuartel de la Policía.
El conocía a la víctima. El carro se lo regaló él. Era un Toyota Tercel de 1999, color verde.
Lo entrevistó el Policía Martínez. Luego llegó su sobrino José Bonano. Su sobrino le dijo que el carro que salió de la entrada de la casa volvió a pasar por allí. El se lo dijo a la Policía que el carro era un Tercel verde, más o menos de 1994 y que iba en ruta de Quebradillas a Guayabota.
Esa noche vio un vehículo arrancando de la entrada de la casa. No sabe la marca ni la tabilla, ni cuántas personas había adentro.
José Valentín Bonano Gómez declaró que vive en el Barrio Quebradillas de Yabucoa hace 22 años. Entre su casa y la casa de su tío Pablo hay 330 pies.
La noche de los hechos, estaba en su casa viendo televisión. Escuchó un golpe de un carro. Se quedó pendiente y escuchó que lo aceleraron. Salió y vio una muchacha que subió por su casa. La muchacha le dijo algo, de que estaban peleando. Se fue de su lado y él observó un carro Tercel color verde subir por su casa. El carro se fue y él llegó a casa de su tío. Cuando llegó, vio a la víctima tirado en el piso. Estaba su tío Pablo y su primo Armando. Cuando estaba allí, observó de lejos que el carro que subió bajaba otra vez. Era un Toyota Tercel verde, de 1994.
El agente Ramón Martínez López declaró que para la fecha de los hechos estaba destacado en la División de Homicidios de Humacao. El fue quien investigó el caso.
Después del incidente, la noche de los hechos, el apelante estaba en una celda y le pidió que lo sacara a fumar. El agente le preguntó el nombre y el apelante se lo dio. Lo sacó a fumar, esposado. El padre del apelante estaba con él. El le preguntó si tenía algo que decirle. Le hizo las advertencias. El apelante le dijo que le dio unos batazos a la víctima por culpa de una muchacha, que era una mentirosa.
Cuando llegó a la celda del cuartel de la Policía, no sabía cuánto tiempo llevaba arrestado el apelante. Lo arrestó el agente Meléndez de la División de Operaciones Especiales. El apelante estaba solo en la celda. El le dijo al apelante, que era sospechoso de un asesinato. Le hizo las advertencias. Luego de eso, el apelante le pidió que lo sacara a fumar. El lo sacó para ganarse su confianza. El apelante fumó y pidió hablar con su papá. Cuando terminó de fumar, lo llevó al interior del cuartel. Le volvió a hacer las advertencias. Luego le pidió las generales. El apelante comenzó a hablar. El lo detuvo, le hizo las advertencias por tercera vez y él las firmó. Luego confesó.
La agente Lisa Torres Sánchez declaró que estaba adscrita al Cuartel de Yabucoa. Para la fecha de los hechos, trabajaba como retén. Recibió una llamada como a las 10:35 p.m. de que mataron a una persona frente a *1010 una casa con un bate. Tomó los datos y llamó a las unidades. El Sr. Gómez les dijo a los agentes que el vehículo estaba pasando por allí otra vez y que el agresor conducía un Toyota color verde de 1994. Pasó la información por radio a dos patrulleros que le dijeron que iban a intervenir con un automóvil que correspondía a la descripción. Ella les dijo que cuando intervinieran, que miraran dentro del carro, para ver si había un bate. Ellos respondieron que sí. Ella les instruyó que no lo tocaran.
El agente Luis Meléndez García estaba adscrito a la Unidad de Operaciones Especiales de Humacao. La noche de los hechos estaba en una patrulla con la agente Doris Burgos. A eso de las 10:30 p.m., escuchó que la retén pasó una nota para que estuvieran pendientes de un Toyota Tercel color verde, que su conductor agredió con un bate a una persona en el Barrio Quebradillas de Yabucoa. Luego le dijeron que el carro estaba chocado en su parte frontal.
Él se detuvo en la intersección con la carretera 9914. Luego de varios minutos, vio un Toyota Tercel verde que venía chocado por el bonete y botando humo. Le dio alcance. El automóvil lo conducía el apelante. Lo detuvo. Luego llegó el agente Sustache del Distrito de Yabucoa. El sacó una linterna y observó que entre el asiento y donde estaban los cambios había un bate. El bate tenía manchas rojas, que a su entender eran de sangre. Procedió a arrestar al apelante. Le leyó las advertencias. Le pidió a los policías municipales de Yabucoa que lo llevaran al cuartel. El se quedó custodiando el vehículo.
El agente Carlos Sustache Sustache declaró que estaba en la División de Operaciones Tácticas de Humaco. La noche de los hechos, estaba de turno entre 7:00 p.m. y 3:00 a.m. Surgió una querella en el Barrio Quebradillas por una agresión. El se dirigió al lugar. Por el camino vio un carro que coincidía con la descripción que le habían pasado. Los compañeros de Operaciones Especiales ya lo habían detenido. Luego fue a investigar la querella en el lugar de los hechos. Los paramédicos ya estaban ahí. Encontró a una persona en el suelo. Los paramédicos certificaron que estaba muerta.
Sheryl de Jesús Nogueras declaró que tiene 17 años y es estudiante. Salía con el occiso. El día de los hechos estaba en casa de sus tíos en Guayabota en Yabucoa. Llegó el occiso para salir hacía la Playa Lucía de Yabucoa. Fueron a la playa y allí se encontraron al apelante y comenzaron a compartir y beber.
■ El apelante y el occiso estaban jugando billar. Decidieron ir a otro negocio en el Barrio Guayabota. Salieron como a las 8:00 p.m. El negocio en Guayabota se llamaba La Lambada. Ella fue con el occiso en un Tercel verde oscuro. El apelante los seguía en un Tercel verde claro. Llegaron a La Lambada y se encontraron con otras personas. Estaban compartiendo cuando la señora Nereida empezó a meter cizaña. El apelante y el occiso estaban jugando billar. Le dijo al apelante que se iba a ir, porque la Sra. Nereida estaba hablando muchas cosas y se iban para evitar problemas. Se fueron a otro negocio, el apelante, el occiso y ella. Se llamaba La Loma. Se pararon porque al apelante se le ponchó una goma. El occiso se bajó para ayudarlo a cambiarla. En ese momento, llegaron las personas que estaban en La Lambada. Eran como 5 carros. Se formó una discusión. El apelante se enfogonó y tiró una botella de Heineken al carro del occiso. Ella estaba dentro del carro. El occiso se bajó y le metió un puño al apelante. Luego se montó en el carro para llevarla a su casa.
Cuando iban para su casa, el apelante los perseguía. El occiso decidió pedirle ayuda al Sr. Gómez. El apelante estaba chocándolo por detrás mientras conducía, no recuerda cuántas veces lo hizo. Cuando el occiso decide meterse a casa del Sr. Gómez, el apelante lo embistió más duro. El carro del occiso se trepó en una lomita. Ella se bajó. El apelante se estacionó más abajo. El apelante se bajó con un bate y le dio al guardalodos del carro del occiso. El occiso estaba en el carro. Ella fue a buscar ayuda a una casa que había más arriba, donde estaba un muchacho blanquito. No sabe lo que ocurrió mientras ella hablaba con el muchacho. Luego fue a casa de sus tíos a pedir ayuda.
Su relación con el apelante era de pareja, llevaban como 2 ó 3 meses. A la fecha de los hechos, estaban *1011 separados hacía unos meses.
Cuando llegó a casa de sus tíos, les dijo que había pasado un problema entre el apelante y el occiso, pero ella no sabía cuál fue el desenlace. Se tomó una pastilla, porque estaba nerviosa, y se acostó a dormir. Luego vinieron los guardias y le dijeron que los acompañara porque el apelante y ella eran sospechosos.
En el contrainterrogatorio, declaró que compartió amigablemente con el occiso y con el apelante en el negocio de Playa Lucía. Ella compartió antes allí con el occiso. Fueron a La Lambada. Allí estaba Nereida y su esposo y también don Angel, quien atendía el negocio. Nereida comenzó a meter cizaña.
Ella no tenía relación amorosa con el occiso. Besó al apelante frente al occiso y éste no dijo nada. Decidieron salir de allí y se lo dijo al apelante, quien los siguió hasta La Loma. Cuando llegaron a La Loma, llegaron otras personas, incluyendo a Nereida y el esposo. De las personas que llegaron, algunas tenían bates. Estaban discutiendo con el apelante. El occiso estaba callado. El apelante le tiró una botella de Heineken al carro del occiso. El occiso se bajó y le dio un puño. Luego se montó y se fue a casa de ella. Llegaron hasta casa del Sr. Gómez. Ella se bajó del carro y se fue a correr. Desconoce lo que pasó allí.
Miguel Vega Puig declaró que es agente de la Policía. Trabaja en la División de Servicios Técnicos. La noche de los hechos, trabajó como fotógrafo. Tomó fotografías del occiso y del lugar de los hechos.
Luis Alberto Flores Laboy declaró que es hermano del occiso. La noche de los hechos identificó su cadáver.
Jorge Alberto Del Morán Rivera declaró que reside en el Barrio Calabazas Debajo de Yabucoa. Su pareja es Nereida Negrón Meléndez. Acostumbran ir los fines de semana a La Lambada.
La noche de los hechos, llegó al negocio con su esposa. A las 9:00 p.m., llegó el occiso con su novia Sheryl. Ella fue adonde el apelante y se besaron. El occiso se quedó mirándolos. Luego dijo que la iba a llevar a su casa. El apelante se fue detrás del occiso. El le dijo a su esposa “vamos a seguirlo porque algo está tramando." Llegaron al negocio La Loma, que estaba cerrado. Bloqueó con su automóvil al del apelante. El apelante estaba fuera del carro con un bate y comentaba que si le iban a dar. El apelante tenía problemas con una goma. El le ofreció ayudarlo. El apelante metió el bate en el carro y se tranquilizó.
Habló con el apelante, quien le dijo que Sheryl era su novia. El le contestó que no, que era novia del occiso. El apelante le reclamaba a Sheryl que porqué le había hecho eso. Sheryl le decía al apelante que el occiso era su tío y al occiso que el apelante era su primo. El apelante le tiró una botella al cristal del carro del occiso y lo rompió. El occiso le dio un puño al apelante. Este le dijo “te voy a matar, eres hombre muerto. ” Luego, el occiso se montó en su carro y siguió su camino. El apelante le dijo que no subió para buscar problemas con nadie, que él no era persona de buscar problemas y que se iba para su casa. El apelante estaba tranquilo. El se montó en el carro con Nereida y se fue para el negocio. El apelante se montó en el carro de él y se fue en la misma dirección que el occiso.
Regresó al negocio La Lambada. Al rato le entró una llamada a uno de los muchachos en la que indicaban que mataron al occiso.
En el contrainterrogatorio declaró que cuando el occiso llegó al lugar con su novia, no vio que el apelante y él estuvieran compartiendo o jugando billar juntos. Cuando el occiso y Sheryl se fueron, el apelante los siguió. Él se les fue detrás con su esposa hasta el negocio La Loma. No había más vehículos con él. Él no se bajó con un bate. El apelante le preguntó que porqué lo estaban siguiendo. La esposa de él hablaba con el occiso.
El apelante empezó a discutir con Sheryl y la agarró por la chaqueta. Cuando el apelante tiró la botella al *1012 carro, Sheryl estaba montada en el vehículo.
Maria Matos Rivera declaró que es Seróloga Forense en el Instituto de Ciencias Forenses de Puerto Rico. Identificó un análisis de un bate que se le ocupó al apelante. El resultado dio positivo a la presencia de sangre, que coincidía con la del occiso. El análisis tiene un 99.99% de confiabilidad.
María Hernández Miranda declaró que es Técnico de Control y Custodia del Instituto de Ciencias Forenses. Declaró sobre su custodia de la evidencia. También declararon lo mismo Murphy Rivera Alicea, técnico de recibo de evidencia del Instituto de Ciencias Forenses y Benjamín Acosta García, Supervisor de la Sección de Recibo de Evidencia del Instituto.
A base de la prueba desfilada, el jurado declaró culpable al apelante. El Tribunal procedió a imponerle las penas mencionadas.
III
En su recurso, el apelante plantea que el Tribunal erró al declararlo culpable de los delitos imputados y al admitir como evidencia la confesión prestada por él.
La Constitución del Estado Libre Asociado de Puerto Rico, según se conoce, consagra en su Art. II, Sección 11, la garantía a todo acusado de un delito de que se le presuma inocente, debiendo establecerse su culpabilidad más allá de duda razonable. Pueblo v. Irizarry, 156 D.P.R. 780, 786 (2002); Pueblo v. González Román, 138 D.P.R. 691, 707 (1995); Pueblo v. Rosaly Soto, 128 D.P.R. 729, 739 (1991); véase, además, la Regla 110 de las de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 110.
Al Estado le corresponde el peso para establecer, más allá de duda razonable, los elementos del delito imputado, así como la conexión del acusado con los hechos y la intención o negligencia de éste. Pueblo v. Irizarry, 156 D.P.R. a las págs. 786-787; Pueblo v. Acevedo Estrada, 150 D.P.R. 84, 99 (2000).
La prueba requerida no sólo tiene que ser suficiente en derecho, sino que debe ser satisfactoria, esto es, capaz de producir “certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido”. Pueblo v. Acevedo Estrada, 150 D.P.R. a la pág. 100; Pueblo v. González Román, 138 D.P.R. a la pág. 707; Pueblo v. Cabán Torres, 117 D.P.R. 645, 652 (1986).
El Tribunal Supremo de Puerto Rico ha aclarado que la duda razonable es aquella insatisfacción o intranquilidad en la conciencia del juzgador sobre la culpabilidad del acusado una vez desfilada la prueba. Pueblo v. Torres Rivera, 129 D.P.R. 331, 341 (1991).
Ello no implica que deba destruirse toda duda posible, sea especulativa o imaginaria, ni que la culpabilidad del acusado tenga que establecerse con certeza matemática. Pueblo v. Rosario Reyes, 138 D.P.R. 591, 598 (1995); Pueblo v. Pagán, Ortiz, 130 D.P.R. 470, 480 (1992); Pueblo v. Bigio Pastrana, 116 D.P.R. 748, 760-761 (1985). Sólo se exige que la prueba brinde la certeza moral que convence, dirige la inteligencia y satisface la razón.
No obstante, en aquellos casos en que la prueba no establezca la culpabilidad más allá de duda razonable, no puede prevalecer una sentencia condenatoria. Pueblo v. Acevedo Estrada, 150 D.P.R. a las págs. 100-101; Pueblo v. González Román, 138 D.P.R. a la pág. 708; Pueblo v. Maisonave Rodríguez, 129 D.P.R. 49, 63 (1991).
En tales casos, la revisión de la determinación sobre culpabilidad del acusado se considera una cuestión de derecho. Pueblo v. Acevedo Estrada, 150 D.P.R. a la pág. 100; Pueblo v. González Román, 138 D.P.R. a la pág. *1013 708; Pueblo v. Cabán Torres, 117 D.P.R. a la pág. 653.
En el presente caso, el apelante fue declarado culpable de asesinato en primer grado, 33 L.P.R.A. see. 4734, así como de haber utilizado un arma blanca contra otra persona, 25 L.P.R.A. sec. 458d (Supl. 2008).
La prueba sostiene ampliamente el veredicto del jurado. El apelante no sólo confesó la comisión del delito, sino que la prueba fue suficiente para establecer que la noche de los hechos, éste tuvo un altercado con el occiso, debido a que ambos tenían relaciones con la joven de Jesús. El altercado fue observado por muchos testigos. La joven de Jesús declaró que el apelante la siguió a ella y al occiso hasta el frente de la casa del Sr. Gómez, donde el occiso fue posteriormente encontrado sin vida. Al apelante se le ocupó un bate que tenía la sangre del occiso.
Entendemos que la prueba mencionada es suficiente para sostener la convicción del apelante.
La norma, según se conoce, es que en ausencia de pasión, prejuicio, parcialidad o error manifiesto, este Tribunal no debe intervenir con la apreciación de la prueba realizada por el juzgador de los hechos. Pueblo v. Acevedo Estrada, 150 D.P.R. a la pág. 99; Pueblo v. Somarriba García, 131 D.P.R. 462, 472 (1992); Pueblo v. Maisonave Rodríguez, 129 D.P.R. a las págs. 62-63; Pueblo v. Echevarría Rodríguez I, 128 D.P.R. 299, 316 (1991).
En el presente caso, no percibimos base alguna para alterar la determinación del jurado.
El apelante alega que el Tribunal de Primera Instancia erró al admitir en evidencia la confesión prestada por él.
Como cualquier otro derecho, el derecho contra la autoincriminación es renunciable. Pueblo v. Viruet Camacho, 173 D.P.R _, 2008 J.T.S. 80, a las págs. 1094-1095; Pueblo v. Medina Hernández, 158 D.P.R. 489, 503 (2003); Pueblo v. Rivera Nazario, 141 D.P.R. 865, 888 (1996).
Una confesión es admisible cuando la persona ha renunciado a su derecho de forma voluntaria e inteligente. Pueblo v. Viruet Camacho, 2008 J.T.S. 80, a la pág. 1096; Pueblo v. Medina Hernández, 158 D.P.R. a la pág. 504; Pueblo v. Rivera Nazario, 141 D.P.R. a la pág. 889; Pueblo v. Pellot Pérez, 121 D.P.R. 791, 802 (1988).
La renuncia es voluntaria si es "realizada sin que haya mediado intimidación, coacción o violencia por parte de los funcionarios del Estado en el procedimiento que culmina en la toma de la confesión Pueblo v. Medina Hernández, 158 D.P.R. a la pág. 504; Pueblo v. Rivera Nazario, 141 D.P.R. a la pág. 888; Pueblo v. Ruiz Bosch, 127 D.P.R. 762, 775-776 (1991); Pueblo en interés menor J.A.B.C., 123 D.P.R. 551, 561-562 (1989).
La renuncia es consciente e inteligente si el sospechoso ha sido informado, en forma apropiada, de su privilegio constitucional contra la autoincriminación, incluyendo la advertencia crucial de que cualquier manifestación que haga al respecto podrá ser usada en su contra en un proceso criminal. Pueblo v. Viruet Camacho, 2008 J.T.S. 80, a las págs. 1095-1096; Pueblo v. Medina Hernández, 158 D.P.R. a la pág. 504; Pueblo v. Ruiz Bosch, 127 D.P.R. a las págs. 775-776; Pueblo en interés menor J.A.B.C., 123 D.P.R. a las págs. 561-562.
La voluntariedad de la confesión se analiza a la luz de la totalidad de las circunstancias bajo las cuales se obtuvo la declaración incriminatoria, tomando en cuenta la conducta de los agentes y la situación del interrogado. Pueblo v. Viruet Camacho, 2008 J.T.S. 80, a la pág. 1096, Pueblo v. Medina Hernández, 158 D.P. R. a la pág. 507; Pueblo v. Hernández Mercado, 126 D.P.R. 427, 444 (1990).
*1014 En el presente caso, la prueba reflejó que el apelante decidió confesar luego de que le hicieran las advertencias que requiere la ley en más de una ocasión. No existe base para concluir que esa determinación respondiera a elemento alguno de coacción por parte de las autoridades. Hasta donde este Tribunal puede determinar, la confesión del apelante fue voluntaria, libre e inteligente.
En cualquier caso, aun sin esta confesión, la evidencia presentada fue suficiente para sostener el veredicto del jurado. El error no se cometió.
Por los fundamentos expresados, se confirma la sentencia apelada.
Lo pronunció y lo manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.
María Elena Pérez Ortiz Secretaria del Tribunal de Apelaciones