Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL[1]

| EL PUEBLO DE PUERTO RICO<br><br>Apelada<br><br>v.<br><br>VÍCTOR M. VÁZQUEZ BRAÑA<br><br>Apelante | KLAN202301162 | Apelación procedente del Tribunal de Primera Instancia, Sala de Bayamón<br><br>Crim. Núm.:<br>D IS2022G0020<br><br>Por:<br>Infr. Art. 133 CP |
|---|---|---|

Panel integrado por su presidente, el Juez Sánchez Ramos, el Juez Rivera Torres y el Juez Salgado Schwarz.

Sánchez Ramos, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 27 de junio de 2024.

Luego de un juicio por tribunal de derecho, el Tribunal de Primera Instancia ("TPI") encontró culpable al apelante por el delito de actos lascivos contra una menor de 13 años de edad. Según se explica a continuación, concluimos que (i) el TPI podía válidamente concluir, como lo hizo, que la prueba demostró, más allá de duda razonable, que el apelante cometió el delito imputado, pues la prueba permitía concluir que el apelante sometió a la menor a actos que tendían a despertar o satisfacer sus deseos sexuales, y (ii) el TPI correctamente admitió el testimonio de una psicóloga sobre las comunicaciones del apelante a ella, pues este renunció por escrito a impedir la divulgación de las mismas.

---

[1] El recurso fue asignado a este panel por virtud de lo dispuesto en la Orden Administrativa OAJP-2021-086, de 4 de noviembre de 2021, sobre Normas para la Asignación de Recursos Nuevos Previamente Presentados en el Tribunal de Apelaciones. Como consecuencia de la referida orden, este recurso, así como todo recurso futuro que surja del caso de referencia será atendido por los integrantes de este panel, quienes adjudicaron el correspondiente recurso anterior (KLCE202300755).

I.

El Sr. Víctor M. Vázquez Braña (el "Imputado" o "Apelante") fue acusado de violar el Artículo 133(a) del Código Penal, 33 LPRA sec. 5194*; según la acusación:

> El sospechoso Víctor M. Vázquez Braña, desde diciembre de 2021 a marzo de 2022, en Toa Alta, Puerto Rico, que forma parte de la jurisdicción del Tribunal de Primera Instancia, Sala de Bayamón, ilegal, voluntaria a propósito y criminalmente, sin intentar consumar el delito de agresión sexual (Art. 130 del Código Penal), sometió a la menor X.P.M., quien al momento de los hechos tenía 13 años de edad, a un acto que tendió a despertar, excitar y/o satisfacer la pasión o deseos sexuales del imputado. Consistente en que el sospechoso le tocó y pellizcó el seno izquierdo en más de una ocasión, siendo esta menor de 16 años de edad; en infracción al inciso (a) del Artículo 133 del Código Penal de PR.

Luego del correspondiente juicio, el TPI encontró culpable al Imputado del referido delito. El 7 de diciembre de 2023, el TPI sentenció al Apelante a 15 años de prisión, al pago de una pena especial y lo inscribió en el Registro de Ofensores Sexuales.

Inconforme, el 29 de diciembre, el Imputado presentó el recurso que nos ocupa. El 27 de marzo, el Apelante presentó la Transcripción Estipulada de la Prueba Oral.

En su alegato, el Imputado plantea que no se probó su culpabilidad más allá de duda razonable. En particular, sostiene que hubo una "ausencia total del segundo elemento constitutivo del delito" porque no hubo prueba de que el Apelante "realiz[ara] gemidos, jadeos, muestras de excitación, erección", o de que este realizara "movimientos sexuales o eróticos". El Imputado arguye que ello significa que no se podía inferir que a este "se le despertó, se excitó o sintió satisfacción o pasión o deseo sexual".

Además, el Apelante plantea que el testimonio de una psicóloga que lo atendió no debió ser admitido porque "hubo ausencia total de los elementos excepcionales" por los cuales "ella

no estaría obligada a proteger" sus manifestaciones en el contexto de la terapia brindada.

Por su parte, el Pueblo de Puerto Rico presentó su alegato en oposición. Resolvemos.

II.

Por impugnarse la suficiencia de la prueba desfilada, a continuación se describe la prueba que desfiló durante el juicio, en el cual el Ministerio Público presentó cinco testigos y tres documentos. Antes de describir en detalle lo que declaró cada testigo, adelantamos un resumen de lo declarado por la menor a la cual hace referencia la acusación (la "Víctima").

La Víctima declaró sobre un primer evento que ocurrió cuando esta tenía 13 años de edad. Expuso que, mientras se encontraba "fregando", el Apelante se le acercó por la parte de atrás y con el brazo le rozó el seno izquierdo, lo que hizo que la menor se sintiera incómoda.

La Víctima también declaró sobre un segundo evento, el cual ocurrió cuando esta jugaba *Playstation* en la cama; aseveró que el Apelante le "pellizcó" el seno izquierdo".

Además, la Víctima declaró sobre un tercer evento; afirmó que el Apelante se le acercó con un chocolate en la boca y le pidió a ella que lo tomara de su boca e intentó besarla.

Durante el juicio, **el primer testigo** presentado por el Ministerio Público fue el agente Omar Quiñones Suárez (el "Agente").[2] Su experiencia y capacidad como agente investigador de delitos sexuales fue estipulada por las partes. Declaró que su investigación inició el 18 de abril de 2022, cuando se encontraba trabajando en la División de Delitos Sexuales del CIC de Vega Baja y estaba bajo la supervisión del sargento Edgardo Ramos. Declaró

---

[2] Transcripción Estipulada de la Prueba Oral, págs. 18-69.

que, ese día, recibió un comunicado del Cuartel General de San Juan en el que se hacía referencia a la Dra. Limary Ramos López, psicóloga de la Policía de Puerto Rico (la "Psicóloga"), quien informaba sobre una situación donde estaba involucrado un agente de la Policía.[3]

El Imputado objetó que se admitiera el informe y la comunicación de la Psicóloga, sobre la base del privilegio de psicoterapeutas y pacientes. Dicha objeción fue declarada no ha lugar por el TPI.[4]

Luego, el Agente declaró que la Psicóloga indicó en el comunicado que, en una visita de seguimiento, el Imputado le manifestó que había tenido una discusión con su esposa y, al ella preguntarle sobre el motivo de la discusión, éste le indicó que una amiga de su esposa pernoctaba en su residencia con sus hijos, y que él le había tocado los senos a la Víctima.[5]

Por otro lado, el Agente declaró que entrevistó a la Sra. Delia Soto, esposa del Apelante (la "Dueña"); a la Sra. Katia Marrero Santana, madre de la Víctima (la "Madre"); al Sr. Carlos Panzardi Falcón, padre de la Víctima; a la Sra. Marianne Colón Cartagena, madrastra de la Víctima (la "Madrastra"); y a la Sra. Michelle Panzardi Pabón, tía de la Víctima (la "Tía"); y a la Víctima.

Relató que la Madrastra le indicó que la Víctima le había expresado que el Apelante le había tocado los senos. En otra ocasión la pellizcó el seno izquierdo. También le daba nalgadas y, en una ocasión, le ofreció chocolate y "le decía que tenía que cogérselo con […] su boca". Por su parte, la Víctima le expresó que su mamá se había separado y, en lo que se mudaban, alquiló un cuarto en la residencia del Apelante, desde finales del 2021 a principios del 2022,

---

[3] *Íd.*, págs. 18-19.
[4] *Íd.* págs. 19-25. Véase, además, págs. 185-201.
[5] *Íd.* págs. 21 y 25-26

porque su mamá y la Dueña eran amigas y tenían un negocio de comida en común.

El Agente declaró que la Madrastra le indicó que la Víctima le comunicó que, un día, mientras la Víctima se encontraba en la cocina, el Apelante se le acercó, se paró frente a ella, le tocó el seno izquierdo con su mano derecha, y le dijo "ay, perdón, te toqué ahí". La Víctima le manifestó a la Madrastra que, en ese momento, se sintió incómoda y "se echó para atrás y no quería que [él] se le acercara".

La Víctima también le manifestó a la Madrastra sobre otro incidente, donde ella estaba jugando *PlayStation* en la habitación que había rentado su mamá, el hermano salió hacia el baño y el Apelante llegó a la habitación. Ella tenía unos audífonos puestos, y le pareció que el Apelante le estaba hablando, pero ella lo ignoró porque estaba jugando. El Apelante nuevamente le tocó el seno izquierdo y ella se echó para atrás, como indicando, no me toques.

La Víctima también le expresó a la Madrastra sobre un tercer incidente, en el cual ella estaba acostaba en un sofá mientras hablaba por teléfono con un amigo. El Apelante se le acercó, le ofreció un chocolate y le dijo que, si quería chocolate, lo tenía que coger ella con su boca, y éste le agarró la mano para que se acercara a él; que, en ocasiones, cuando ella se vestía, se miraba al espejo en la sala, y había visto al Apelante observándola; que, a veces, cuando la saludaba con besos en la mejilla, si estaban los dos solos, los besos no eran tan en la mejilla, eran más cerca de la boca. También, en ocasiones, cuando estaban solos, el Apelante le daba nalgadas, le agarraba el pantalón o le tocaba las nalgas. La Víctima le manifestó que no le había dicho nada a su mamá porque no quería

que se rompiera la relación con su amiga, ni que perdiera el negocio que había logrado.[6]

En el contrainterrogatorio, el Agente declaró que entrevistó a otro menor, hermano de la Víctima, pero que este no pudo corroborar la versión ofrecida por su hermana. También expresó que la Víctima no pudo señalar unas fechas exactas de los eventos, pero que identificó el mes de febrero en referencia al evento del chocolate. El Agente también declaró que, en los tres eventos, la Madrastra no indicó que la Víctima hubiese escuchado comentarios, jadeos, gemidos, ni nada que mostrara gestos o prueba de excitación o erección.[7]

**Luego declaró la Víctima,** quien al momento del juicio tenía 15 años de edad.[8] Declaró que, entre los meses de diciembre de 2021 y marzo de 2022, su mamá había rentado un cuarto en la residencia del Apelante porque tuvo una situación. Explicó que, en una ocasión, mientras ella estaba fregando, el Apelante se le acercó para darle un abrazo y que, cuando le iba dar el abrazo, le tocó con la mano derecha; fue como un roce. El Apelante le pidió perdón y le dijo "te toqué aquí", **y la volvió a tocar** "como un roce". Manifestó que ella se sintió "súper mal porque nunca pens[ó] que él [haría] eso". Explicó que, en ese momento, se encontraba en la casa con su hermano y la hija pequeña del Apelante; su madre y la Dueña estaban trabajando.[9]

La Víctima también declaró sobre un segundo incidente, en el que ella se encontraba en el cuarto que su mamá había rentado, junto a su hermano, jugando *PlayStation,* y su hermano se levantó un momento para ir al baño. El Apelante entró al cuarto, se sentó al lado de ella y volvió a tocarle un seno, pero fue "pellizcado".

---

[6] *Íd.* págs. 34-38.
[7] *Íd.*, págs. 47-67.
[8] *Íd.*, pág. 71.
[9] *Íd.*, págs. 71-74

Declaró que, en ese momento, el Apelante volvió a decirle "perdón, te toqué aquí **y volvió y me tocó" el seno**. Indicó que, en ese momento, ella se sintió mal porque él se sentó al lado, le dijo algo y la tocó "así porque sí". Ella no escuchó lo que le dijo el Apelante porque, en ese momento, tenía los audífonos puestos escuchando el juego.[10]

Sobre el tercer incidente, la Víctima declaró que ella se encontraba acostada en un mueble, hablando por teléfono, y el Apelante se asomó y le preguntó con quién estaba hablando. Ella le contestó, y el Apelante le dijo desde lejos **que ella era de él**, pero ella no le hizo caso. El Apelante caminó hacia ella, se sentó a su lado en el mueble y continuó diciéndole lo mismo; que ella era de él, que no podía hablar con más nadie; ella tenía el teléfono en silencio y lo ignoró.

Declaró que el Apelante luego se levantó a buscar unos chocolates. Cuando regresó le ofreció un chocolate, ella le dijo que quería uno y el Apelante se lo puso en la boca para que ella lo cogiera de la boca de él. Como ella no quiso, el Apelante la cogió por los hombros haciéndole fuerza para que cogiera el chocolate con la boca; ella estaba empujándolo. Declaró que este último incidente ocurrió para el mes de febrero. Afirmó que, cuando ocurrió dicho incidente, se sintió "súper" incómoda, porque el Apelante la tocó y le hizo fuerza para que cogiera el chocolate de su boca.[11] Expresó que, cuando ocurrieron los hechos, no le contó a nadie; después sí habló con su Madrastra y con su Tía. Declaró que a ellas les manifestó que el Apelante la había tocado. Luego habló con su papá, con su mamá y con la Dueña. Indicó que habló con la Dueña porque quería que ella supiera lo que había pasado.[12]

---

[10] *Íd.*, págs. 74-76.
[11] *Íd.*, págs. 76-79.
[12] *Íd.*, págs. 79-80.

En el contrainterrogatorio, la Víctima declaró que, en los tres eventos, el Apelante no hizo ningún comentario, gemido o gesto indecoroso que la llevara a pensar que el Apelante estaba excitado de alguna manera.[13] Por otro lado, en el redirecto, la Víctima explicó que no le contó a su mamá lo sucedido de forma inmediata porque ellos vivían en un "cuartito" arrendado y no quería que la botaran porque su mamá aún no había conseguido un apartamento para mudarse.[14]

Asimismo, el testimonio de **la Madrastra** corroboró la versión vertida por la Víctima en cuanto al incidente relacionado con el chocolate. También declaró sobre otro incidente que le relató la Víctima, el cual ocurrió mientras esta jugaba *PlayStation* en el cuarto que tenían rentado en la casa de la Dueña. Sobre dicho incidente, indicó que la Víctima le relató que estaba jugando con su hermano, que éste salió al baño y, en ese momento, el Apelante entró, le tocó el seno izquierdo y, cuando ella se fue a retirar, la agarró por el pantalón. Declaró que la Víctima le expresó que se sintió incómoda y no se atrevió hablarlo con su mamá y con la Dueña por miedo a que no le creyeran porque ellas eran muy amigas.[15]

En el contrainterrogatorio, la Madrastra declaró que la Víctima no le dijo que el Apelante hizo algún gesto de satisfacción o gemido que le llevara a pensar que el Apelante estaba excitado y que no se tocó sus partes.[16]

Por otro lado, **la Madre** también corroboró el testimonio de la Víctima en cuanto a los tres incidentes. Declaró que la Víctima le indicó que, en una ocasión, estaba lavando unos trastes en la cocina y el Apelante le dio un abrazo por la espalda y con su brazo derecho

---

[13] *Íd.*, págs. 91-97.
[14] *Íd.*, págs. 99-100.
[15] *Íd.*, págs. 119-121.
[16] *Íd.*, págs. 133-134.

le tocó el seno. La Víctima le indicó que, en ese momento, trató de repelerlo porque no le gustó. En otra ocasión, la Víctima estaba sentada jugando *PlayStation* y el Apelante se le sentó al lado a hablarle y éste terminó pellizcándole un seno, y él le dijo, "ay perdón que te toqué aquí y **volvió a pellizcarle el seno**". En el tercer incidente, la Víctima estaba sentada en el mueble, hablando por teléfono y el Apelante le ofreció un chocolate, que ella le dijo que sí, y el procedió a tratar de darle el chocolate con contacto con su boca; que lo cogiera de su boca. La Víctima le indicó que intentó repeler el acto porque no le gustó.

Declaró que los tres incidentes ocurrieron en la residencia de la Dueña, quien vivía con el Apelante y con la hija pequeña de él. Indicó que la Víctima estaba en la casa porque ella y la Dueña tenían un negocio en común y, en ocasiones, cuando tenían entregas de comida, el Apelante se quedaba solo con los menores.[17]

En el contrainterrogatorio, la Madre declaró que residió en la casa con la Dueña y el Apelante desde octubre de 2021 a febrero 2022, y que nunca el Apelante le indicó que tenía que mudarse.[18] Declaró que la Víctima nunca le expresó que hubiese algún gesto, gemido, expresión o que el Apelante se tocara sus partes íntimas con la intención de excitarse.[19] Tampoco le expresó que el Apelante le diera nalgadas, pero le hacía el gesto.[20] Añadió que la Víctima le expresó que se sintió incómoda por lo sucedido, que le molestaba la presencia del Apelante, y que le verbalizó que su seguridad estuvo en riesgo.[21]

La última testigo en declarar fue **la Psicóloga**. Antes de declarar la testigo, el Ministerio Público presentó el informe y la comunicación de la Psicóloga, lo cual fue objetado por la defensa.

---

[17] *Íd.*, págs. 159-162.
[18] *Íd.*, págs. 172-173.
[19] *Íd.*, págs. 175-176.
[20] *Íd.*, pág. 179.
[21] *Íd.*, pág. 177.

El Ministerio Público sostuvo que el privilegio psicoterapeuta paciente no es absoluto y está sujeto a ciertas excepciones. Una de esas excepciones es cuando surge, de la comunicación, que un menor de edad esté en peligro de daño.

La Psicóloga declaró que comenzó a trabajar para la Policía de Puerto Rico en el año 2020. Indicó que era terapeuta del Programa de Ayuda al Empleado, y que ella atendía a los miembros y empleados de la Policía de Puerto Rico. Declaró que, el 29 de marzo de 2022, se encontraba en su oficina en la División de Psicología y Trabajo Social de la Policía, en su turno regular de 8:00 am a 4:30 pm.

La Psicóloga detalló el proceso que seguía con los casos que llegaban a su oficina. Al respecto, expresó que la División recibía los casos por dos medios, los casos referidos por un superior o un supervisor que entendiera que la persona debía ser evaluada por el personal de psicología; o de manera voluntaria, cuando la persona entendiera que requería servicio. Añadió que los casos eran recibidos por un psicólogo evaluador quien determinaba si la persona requería un proceso de psicoterapia y, de ser así, lo refería a alguno de los cuatro psicólogos terapeutas que tenía el Negociado.[22]

La Psicóloga declaró que, como parte del proceso, en las primeras sesiones, se completa el historial biopsicosocial del paciente, donde se recopila la información de salud, empleo y familiar. Además, se completa el documento de consentimiento y el de confidencialidad. Explicó que el documento de consentimiento se le entrega a la persona y en el mismo se desglosa que es un proceso voluntario y que el paciente acepta recibir el servicio. Añadió que la persona, de estar de acuerdo, lo completa y, antes de

---

[22] *Íd.*, págs. 204-206.

continuar con el proceso, se discuten los puntos que el documento desglosa, y que se le preguntaba a la persona si tenía alguna duda sobre el documento. De estar de acuerdo, procedían a firmar el documento, tanto el paciente como el terapeuta.[23]

En cuanto al contenido del documento de confidencialidad, la Psicóloga aseveró que este documento contenía el nombre y la información personal del paciente; que la persona aceptaba participar voluntariamente del proceso de psicoterapia; identificaba alguna persona de contacto en caso de emergencia; que la terapeuta se puede comunicar con esa persona en caso de emergencia; y **desglosaba lo establecido en el Artículo 2.18 de la Ley Núm. 408**, que es la Ley de Salud Mental de Puerto Rico. Señaló que dicho artículo establecía que es un proceso confidencial, **salvo que mantener la confidencia pudiese implicar riesgos físicos o emocionales para su persona o para terceros**.[24]

Declaró que, cuando se entregaban estos documentos, se le explicaba al paciente que era importante que los leyera. Antes de iniciar el proceso, ella hacía que se tomaran su tiempo para leerlo; al entrar a la oficina, ella discutía cada uno de los documentos y les preguntaba si tenían dudas, observación u objeción en cuanto al documento. Si le indicaban que tenían alguna preocupación o alguna duda, procedía a explicarle; de no tener, procedían a firmar el documento. Declaró, además, que el principio de confidencialidad tiene unas limitaciones establecidas en todas las leyes y la reglamentación aplicable; en esencia, el referido principio cede una vez el profesional de la salud determina que la persona implica un riesgo para sí mismo o para terceras personas.[25]

---

[23] *Íd.*, págs. 206-207.
[24] *Íd.*, págs. 207-208.
[25] *Íd.*, págs. 208-210.

La Psicóloga declaró que, en el 2020, el Apelante estuvo en un proceso de psicoterapia sobre unos asuntos no relacionados con este caso y, posteriormente, en marzo de 2022, el Apelante compareció a la cita que tenía para cerrar el caso anterior, porque se había cumplido con las metas de psicoterapia.

No obstante, en esa ocasión, el Apelante le indicó que estaba atravesando una situación familiar y le solicitó ayuda. Describió que, en ese momento, procedió a asignarle un nuevo número de caso o programa de ayuda al empleado, porque el anterior había concluido.

La Psicóloga explicó que, en esa ocasión, el Apelante le indicó que estaba separado de su esposa por una situación que había ocurrido con una menor que vivía con ellos en la residencia. El Apelante le describió que la menor estaba en una habitación de la residencia y él se acercó a la menor por la parte posterior y la abrazó, y en el proceso le rozó un seno. El Apelante le indicó que no ocurrió otra situación, pero le solicitó ayuda porque quería evitar que fuera a ocurrir otra situación con la menor.

La Psicóloga declaró que, al recibir la información, orientó al Apelante sobre los principios de confidencialidad y le indicó que se iba a romper la confidencialidad, dado que estaba haciendo alegaciones que podían implicar un riesgo para el bienestar de una menor. Manifestó que orientó al Apelante y consultó el caso con el director de la división, quien también era psicólogo; y se citó al Apelante para dos días más tarde para darle una determinación de cómo se iba a manejar el caso. La Psicóloga declaró que ese día el Apelante estaba afectado y conmovido.

Por último, la Psicóloga indicó que el Apelante fue citado a su oficina el 31 de marzo de 2022 y, ese día, se le orientó que el caso

se estaría refiriendo a la Unidad de Delitos Sexuales para investigación; se le orientó que sería desarmado.[26]

Durante el testimonio de la Psicóloga fueron admitidos varios documentos, entre estos: la Solicitud de Evaluación de incidentes del Apelante (Exhibit 1); el Consentimiento para Consejería y/o Terapia Psicológica (Exhibit 2); y los Principios Básicos de la Política de Confidencialidad (Exhibit 3).[27]

En el contrainterrogatorio, la Psicóloga declaró que, cuando el Apelante fue a la cita en marzo de 2022, aunque era una visita de seguimiento, éste le confió que necesitaba ayuda porque tenía problemas familiares con su esposa. Declaró que el Apelante le indicó que, en un momento, iba a abrazar a la Víctima, le rozó el seno y pidió disculpas.[28]

Sobre la renuncia al privilegio paciente terapeuta, declaró que esta ya se había establecido cuando el Apelante firmó el documento y autorizó a que se divulgara la información.[29] Además, declaró que se cumplió con la excepción a la norma general de confidencialidad.[30] Respecto a los incidentes con la Víctima, la Psicóloga indicó que el Apelante no le dijo que hubo algún jadeo, palabra soez o que mostrara gestos de excitación o erección de parte de él.[31]

Sometido el caso, el TPI determinó que el Apelante había renunciado al privilegio psicólogo-paciente y permitió el testimonio de la Psicóloga, según solicitado por el Ministerio Público.[32]

### III.

En todo proceso penal, el Estado tiene la obligación de probar que el acusado es culpable más allá de duda razonable. Art. II,

---

[26] *Íd.*, págs. 211-214.
[27] *Íd.*, págs. 216-223.
[28] *Íd.*, págs. 226-228.
[29] *Íd.*, pág. 229.
[30] *Íd.*, pág. 240.
[31] *Íd.*, págs. 229-230.
[32] *Íd.*, págs. 242-243.

Sec. 11, Const. ELA, 1 LPRA. Por tal razón, la Regla 110 de las de Procedimiento Criminal, 34 LPRA Ap. II, R. 110, establece que, en todo proceso penal, se presumirá inocente al acusado, mientras no se probare lo contrario y, en todo caso, de existir duda razonable acerca de su culpabilidad, se le absolverá. Véase, además, la Regla 110 de Evidencia, 34 LPRA Ap. VI, R. 110(f).

En cuanto a la prueba testimonial, "la evidencia directa de una persona testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que otra cosa se disponga por ley". 32 LPRA Ap. VI, R. 110(d). Véase, además, *Trinidad v. Chade*, 153 DPR 280, 291 (2001). Es al juzgador de hechos a quien le corresponde resolver la credibilidad de un testigo cuando haya partes de su testimonio que no sean aceptables e incluso sean increíbles. *Pueblo v. Chévere Heredia*, 139 DPR 1, 15-16 (1995). Después de todo, "no existe el testimonio perfecto; el cual de ordinario, en lugar de ser indicativo de veracidad, es altamente sospechoso por cuanto, por lo general, es producto de fabricación." *Pueblo v. Cabán Torres,* 117 DPR 645, 656 (1986). Por esta razón, las contradicciones de un testigo, sean estas intrínsecas o relacionadas con otros testimonios, no conllevan necesariamente la revocación de un fallo condenatorio, a menos que produzcan en el foro apelativo una "insatisfacción o intranquilidad de conciencia tal" que estremezca su sentido básico de justicia. *Pueblo v. Rivero, Lugo y Almodóvar,* 121 DPR 454, 474 (1988); véase, además, *Pueblo v. Santiago Lugo,* 134 DPR 623, 631 (1993).

De otra parte, la determinación de culpabilidad de una persona es revisable en apelación, pues la apreciación de la prueba desfilada en un juicio es un asunto combinado de hecho y de derecho. *Cabán Torres*, 117 DPR, a la pág. 653. No obstante, al evaluar la prueba presentada ante el juzgador de los hechos, los tribunales apelativos deben reconocer la inigualable posición en que

están los foros de primera instancia. *Íd.*, a las págs. 653-654. Es ese juzgador primario quien observa el comportamiento de los testigos al momento de declarar y, sobre la base de ello, adjudica su credibilidad. *SLG Rivera Carrasquillo v. AAA,* 177 DPR 345, 357 (2009).

En este contexto, y en cuanto a la apreciación de la prueba, no nos corresponde determinar, a base de nuestra propia apreciación independiente de la prueba, si hubiésemos declarado culpable al imputado por entender que se demostró su culpabilidad más allá de duda razonable. En vez, nuestra función en este contexto se circunscribe, propiamente, a determinar si el juzgador de hechos, con la prueba que tenía ante sí, podía razonablemente concluir que el acusado era culpable, más allá de duda razonable, de los delitos imputados. Art. II, Sec. 11, Const. ELA, 1 LPRA; Regla 110 de las de Procedimiento Criminal, 34 LPRA Ap. II, R. 110; *Pueblo v. Maisonave Rodríguez,* 129 DPR 49 (1991); *Rivero, Lugo y Almodóvar, supra.* Véase también, *Jackson v. Virginia,* 443 U.S. 307, 317 (1979) (en apelación, solo procede revocar por insuficiencia de prueba cuando "no rational trier of fact could find guilt beyond a reasonable doubt").

En resumen, la apreciación de la prueba por el juzgador de los hechos es merecedora de una gran deferencia por parte del tribunal apelativo. *Pueblo v. Rodríguez Pagán,* 182 DPR 239, 258-259 (2011). Por ello, en "ausencia de pasión, prejuicio, parcialidad o error manifiesto, y a menos que la apreciación de la prueba se aleje de la realidad fáctica o la prueba sea inherentemente imposible o increíble", debemos, como foro apelativo, abstenernos de intervenir con la misma. *Maisonave Rodríguez,* 129 DPR, a la pág. 63.

IV.

Contrario a lo planteado por el Imputado, el TPI correctamente concluyó que el testimonio de la Psicóloga era admisible. Ello pues el récord demuestra que el Imputado, por anticipado, renunció al mismo si la Psicóloga concluía que la divulgación de lo transmitido a ella era necesario para mitigar un riesgo a una menor. Ello fue exactamente lo que sucedió aquí.

Los privilegios surgen de la Constitución, de la ley, de las Reglas de Evidencia o de leyes especiales. *Pueblo v. Fernández Rodríguez*, 183 DPR 770, 783 (2011). La Regla 508 de las de Evidencia, 32 LPRA Ap. VI, R. 508, contempla el privilegio psicoterapeuta-paciente. La regla dispone que el paciente puede rehusar revelar, o impedir que un tercero divulgue, una comunicación confidencial[33] sobre el diagnóstico y tratamiento de su condición mental o emocional. 32 LPRA Ap. VI, R. 508(B).

Ahora bien, el privilegio psicoterapeuta-paciente no es irrestricto. No podrá invocarse cuando: (1) las comunicaciones son pertinentes a una controversia en un procedimiento para hospitalizar al o la paciente por razón de enfermedad mental y según la recomendación de un psicoterapeuta; (2) cuando el tribunal ha ordenado un examen de la condición mental o emocional del paciente; o (3) cuando el paciente invoca su condición mental como un elemento de su reclamación o defensa en un procedimiento judicial, excepto cuando el privilegio es invocado por una persona autorizada en beneficio de un menor de edad que ha recibido servicio de diagnóstico y tratamiento por parte de un psicoterapeuta. 32 LPRA Ap. VI, R. 508(D).

Por su parte, los privilegios, incluidos los de rango constitucional, son renunciables. *Pueblo v. Fernández Rodríguez*,

---

[33] La citada regla define el término "comunicación confidencial" como aquella que se hace sin el propósito de que sea divulgada a terceras personas.

183 DPR 770, 789 (2010), citando a Chiesa Aponte, *Tratado de Derecho Probatorio*, San Juan, Pubs. JTS, 2005, T. I., págs. 173-174. Como norma general, estos tienen que ser renunciados de forma voluntaria, consciente e inteligente. *Fernández Rodríguez*, 183 DPR, a la pág. 789, citando a *Moran v. Burbine,* 475 U.S. 412 (1986); *Pueblo en interés menor J.A.B.C.,* 123 DPR 551 (1989); *Pueblo v. López Rodríguez*, 118 DPR 515 (1987).

La renuncia de un privilegio será voluntaria si es "realizada sin que haya mediado intimidación, coacción o violencia por parte de los funcionarios del Estado en el procedimiento que culmina en la toma de la confesión". *Fernández Rodríguez*, 183 DPR, a la pág. 789, citando a *Pueblo v. Ruiz Bosch*, 127 DPR 726, 775 (1991); *Pueblo en interés menor J.A.B.C., supra.* Para que se entienda renunciado un privilegio, su dueño o poseedor debe ser advertido o informado por las autoridades pertinentes de su derecho al privilegio y de la existencia del mismo. *Fernández Rodríguez*, 183 DPR, a la pág. 789.

En este caso, el Apelante renunció al privilegio psicoterapeuta-paciente por escrito en cuanto a comunicaciones cuya divulgación vaya dirigida a mitigar un riesgo a la salud física o emocional de un tercero.  Lo declarado por la Psicóloga, sobre lo que el Imputado le comunicó, enmarca perfectamente dentro del ámbito de la referida renuncia.

El récord demuestra que, como parte de la entrevista inicial con la Psicóloga, al Imputado se le entregaron y explicaron los documentos de Consentimiento y la Política de Confidencialidad, documentos que fueron admitidos como evidencia.  Antes de iniciar el proceso de psicoterapia, también se le explicó al Apelante en qué consistía el privilegio psicoterapeuta y paciente.  Del récord surge que los referidos documentos claramente establecen que la

Psicóloga tendría la obligación de divulgar las comunicaciones del Imputado si de las mismas surgiese un riesgo de daño a un tercero.

Lo comunicado por el Apelante a la Psicóloga está dentro del alcance de la referida excepción al compromiso general de confidencialidad de las comunicaciones entre ambos. Adviértase que el Imputado le indicó a la Psicóloga que había ocurrido un incidente con una menor donde le rozó un seno **y le solicitó ayuda porque quería evitar que fuera a ocurrir otra situación con la menor**.

La Psicóloga declaró que, acto seguido, orientó a Imputado sobre el hecho de que tendría que divulgar dicha comunicación y así referir el asunto para investigación. Ello pues la comunicación implicaba un riesgo patente para el bienestar de una menor.

Incluso, la Psicóloga no solamente podía divulgar la comunicación, sino que **tenía la obligación de hacerlo**, de conformidad con lo establecido por el Artículo 2.18 de la Ley 408-2000, 24 LPRA sec. 6153q.[34] Por tanto, actuó correctamente el TPI al concluir que había mediado una renuncia del Imputado al privilegio en cuanto a las comunicaciones sobre las cuales la Psicóloga declaró.

V.

Por otro lado, concluimos que la prueba desfilada le permitía al TPI concluir, más allá de duda razonable, que el Apelante es culpable del delito imputado. Veamos.

El Artículo 133(a) del Código Penal, *supra*, tipifica el delito de actos lascivos de la siguiente forma:

> Toda persona que a propósito, con conocimiento o temerariamente, sin intentar consumar el delito de agresión sexual [...], someta a otra persona a un acto que tienda a despertar, excitar o satisfacer la pasión o

---

[34] Cuando una persona le comunique a un psiquiatra, psicólogo clínico o trabajador social, una amenaza de violencia física contra tercero, el psiquiatra, psicólogo o trabajador social tendrá el deber de advertir a ese tercero sobre la posibilidad de amenaza, cuando éste pueda ser razonablemente identificado, y luego de cumplir con lo dispuesto en este Artículo [...].

deseos sexuales del imputado, en cualquiera de las circunstancias que se exponen a continuación, será sancionado con pena de reclusión por un término fijo de ocho (8) años, más la pena de restitución, salvo que la víctima renuncie a ello:

(a) Si la víctima al momento del hecho es menor de dieciséis (16) años.

[…].

El TPI podía válidamente concluir que los actos del Imputado, sobre los cuales desfiló abundante prueba, son de los que tienden a despertar, excitar o satisfacer la pasión o deseos sexuales de una persona.

Contrario a lo planteado por el Imputado, no era necesario, para llegar a dicha conclusión, que desfilara prueba directa sobre una erección del Imputado, ni sobre algún "gemido" o "jadeo" suyo. Es decir, no se requiere prueba directa sobre "expresión de lascivia, excitación, pasión o deseo sexual con el cuerpo de otra persona" para que se configure el delito. El estatuto lo que requiere es que el acto "tienda a despertar, excitar o satisfacer la pasión o deseos sexuales del imputado" y que no se haya intentado consumar el delito de agresión sexual. Esto se puede demostrar con prueba circunstancial, por lo que tampoco es necesaria prueba directa sobre excitación sexual evidente.

La Víctima declaró con detalle sobre los actos del Imputado, y la Madrastra y la Madre declararon que la Víctima les había hablado sobre estos. Los actos ocurrieron entre los meses de diciembre de 2021 y marzo de 2022, cuando la Víctima tenía 13 años.

Según la prueba arriba reseñada, y evidentemente creída por el TPI, el Apelante tocó el seno izquierdo de la Víctima con su mano derecha cuando ella estaba fregando y el Apelante se le acercó para abrazarla. El Apelante le pidió perdón, le dijo "te toque aquí", pero volvió a tocarla. Ello le permitía al TPI concluir que el acto fue intencional.

También la Víctima declaró que, otro día, el Imputado le pellizcó un seno mientras ella jugaba *Playstation*. Una vez más, el Imputado le pidió "perdón", mientras le tocaba nuevamente el seno. Estos dos incidentes, en cada uno de los cuales el Imputado tocó un seno de la Víctima dos veces, le permitía al TPI concluir que los actos del Apelante fueron intencionales.

El TPI podía concluir que dichos actos, por sí solos, son de los que tienden a despertar los deseos sexuales del Imputado. Pero hay más. Sobre la base del incidente con el chocolate, el TPI podía concluir, sin lugar a duda razonable, que los actos del Imputado iban, en efecto, dirigidos a satisfacer sus deseos sexuales. Adviértase que la prueba al respecto fue que el Imputado intentó besar la Víctima cuando le pidió que tomara un chocolate que éste tenía en su boca y le hacía fuerzas con sus manos para que se acercara hacia él.

Así pues, los testimonios fueron suficientes para establecer que el Imputado cometió el delito imputado en más de una ocasión. En lo pertinente, el delito consiste en cometer un acto que "tienda a despertar, excitar o satisfacer la pasión o deseos sexuales del imputado". En este caso, se probó, además, que el acto se cometió contra una persona que, al momento de los hechos, fuese menor de 16 años de edad. Art. 133 (a) del Código Penal de Puerto Rico, *supra*.[35]

En fin, la prueba presentada por el Ministerio Público fue amplia, le mereció la credibilidad al TPI y claramente le permitía a dicho foro concluir, más allá de duda razonable, que el Imputado cometió el delito imputado.

---

[35] Contrario a lo que arguye el Imputado, entre los elementos del delito no se encuentra el que se pruebe que el acto al que sea sometida la víctima esté relacionado con el "área vaginal, anal o con una relación orogenital, digital o instrumental".

VI.

Por los fundamentos expuestos, se confirma la Sentencia apelada.

Lo acuerda y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones